

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 72343-0-I |
| | ) | |
| ANGELIKA MCNAUGHT, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | |
| | ) | PUBLISHED OPINION |
| and | ) | |
| | ) | |
| BYRON MCNAUGHT, | ) | |
| | ) | |
| Appellant. | ) | FILED: August 17, 2015 |
| | ) | |

LEACH, J. — Byron McNaught appeals the trial court's relocation order allowing Angelika McNaught and their daughter, A.J.M., to move to Texas. He challenges the trial court's application of the relocation presumption, the trial court's evaluation of the statutory relocation factors, and the sufficiency of the evidence to support the trial court's relocation decision. Additionally, he makes legal challenges to certain parenting plan provisions. Finally, he challenges the trial court's award of attorney fees to Angelika and asks this court not to award her fees on appeal.

Because the relocation presumption reflects a legislative policy decision and Washington case law requires a quantum of proof to rebut it, this presumption shifts the burdens of production and persuasion to the parent opposing the relocation. The trial court correctly applied the presumption.

The record includes evidence addressing each relevant relocation factor, and the trial court's findings reflect its consideration of each factor. Substantial evidence supports these findings and the trial court's relocation decision. But the evidence does not support the parenting plan notice provisions. And, because a parent may delegate its residential time to family members absent any indication of harm to a child, the trial court abused its discretion by denying Byron this discretion. Byron's other challenges to the parenting plan lack merit. Because Byron earns significantly more than Angelika, we conclude that the trial court did not abuse its discretion when it awarded Angelika attorney fees. We affirm in part, reverse in part, deny fees to both parties, and remand for further proceedings consistent with this opinion.

## FACTS

Angelika and Byron McNaught met in Texas and married there in 2004. In 2010, they moved to Seattle, so Byron could take a job. Angelika began a web design position, allowing her to work from their home on Mercer Island. They had a child, A.J.M., in February 2012. As an infant, A.J.M. woke up four or five times per night, leaving both parents, especially Angelika, sleep deprived. Byron's parents moved from Florida to Mercer Island, and Byron's mother, Laurel McNaught, provided childcare to A.J.M. A.J.M. and Byron's parents became close. But in the months after A.J.M.'s birth, Byron and Angelika's marriage

began to have difficulties. Angelika criticized Byron for the social time he spent with coworkers and pursuing hobbies and believed that the time he spent away from home indicated that he did not want to parent.

In June 2013, Angelika and Byron separated. Angelika petitioned for dissolution of marriage.

On July 12, 2013, Angelika filed a motion for temporary orders allowing her to relocate A.J.M. to Texas, where her family lives. The trial court denied her request. It also appointed Dr. Wendy Hutchins-Cook to make recommendations about a parenting plan and the relocation issue. The trial court ordered that A.J.M.'s childcare by Laurel McNaught continue but provided Angelika the option for Laurel McNaught to provide care in Byron's home. By January 2014, Angelika had gradually reduced and then eliminated Laurel's care of A.J.M.

Between January and April 2014, Dr. Hutchins-Cook performed psychological testing, observed A.J.M. with each parent, and conducted interviews with the parents and third parties. She issued her report on April 21, 2014. Angelika reported to Dr. Hutchins-Cook that she did not plan to relocate, though she wanted to be near her family, because the trial court had required that she remain in Washington. She said that she had come to realize it was better for A.J.M. to be around her father more and said that she would stay, reporting that her parents closed their restaurant and hoped to buy property in

Washington. Angelika's mother temporarily stayed with her and helped with A.J.M.

Dr. Hutchins-Cook concluded that A.J.M. is more reactive and sensitive than other children and fares better with gradual rather than dramatic changes. Dr. Hutchins-Cook found A.J.M. to be well bonded with each parent, finding no concerns with either parent's ability to fulfill parenting functions. She found that Angelika had provided a majority of A.J.M.'s care. She also found A.J.M. to be attached to Byron's parents and Angelika's mother. Dr. Hutchins-Cook recommended a residential schedule that gradually reached a week-on, week-off schedule by the time A.J.M. turned five.

Dr. Hutchins-Cook did not evaluate the issue of relocation because at the time of evaluation, Angelika did not plan to move. But she did find that A.J.M. had established relationships with relatives in Texas. Before trial, Angelika filed a second notice of intended relocation. Her parents were not able to move to Washington permanently. She stated in her notice that her move would depend on the trial court's decision.

At trial, Angelika, Byron, Dr. Hutchins-Cook, and other witnesses who knew the parents and A.J.M. testified to A.J.M.'s relationship with her parents. Though Dr. Hutchins-Cook did not evaluate the issue of relocation, she did testify about relocation issues.

-4-

The trial court allowed the requested relocation and adopted a parenting plan. The trial court denied Byron's motion for stay. After Byron appealed, this court denied a second motion for stay.

## STANDARD OF REVIEW

Parental rights constitute a protected, fundamental liberty interest under the Fourteenth Amendment to the United States Constitution.[1] This court reviews a trial court's parenting plan decision for an abuse of discretion.[2] A trial court abuses its discretion when it makes a manifestly unreasonable decision or bases its decision on untenable grounds or untenable reasons.[3]

> "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard."[4]

## ANALYSIS

### Relocation Presumption

The child relocation act (CRA), RCW 26.09.405-.560, provides notice requirements and standards for changing the primary residence of a child who is

---

[1] In re Marriage of Chandola, 180 Wn.2d 632, 646, 327 P.3d 644 (2014) (quoting In re Custody of Smith, 137 Wn.2d 1, 14-15, 969 P.2d 21 (1998)).

[2] In re Marriage of Littlefield, 133 Wn.2d 39, 46, 940 P.2d 1362 (1997).

[3] Chandola, 180 Wn.2d at 642 (quoting In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012)).

[4] In re Marriage of Horner, 151 Wn.2d 884, 894, 93 P.3d 124 (2004) (quoting Littlefield, 133 Wn.2d at 47).

the subject of a court order regarding residential time.[5]  If a person entitled to residential time or visitation objects to a child's relocation, the person seeking to move the child may not relocate the child without court approval.[6]

Upon a proper objection, a trial court must conduct a fact-finding hearing on the proposed move.[7]  RCW 26.09.520 establishes a rebuttable presumption permitting the move:

> There is a rebuttable presumption that the intended relocation of the child will be permitted.  A person entitled to object to the intended relocation of the child may rebut the presumption by demonstrating that the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person.

This presumption incorporates and gives substantial weight to the traditional presumption that a fit parent acts in his or her child's best interests, including when that parent relocates the child.[8]  "The CRA shifts the analysis away from only the best interests of the child to an analysis that focuses on both the child and the relocating person."[9]  A person opposing the move must rebut the presumption by a preponderance of the evidence.[10]

---

[5] In re Marriage of Wehr, 165 Wn. App. 610, 612, 267 P.3d 1045 (2011).
[6] RCW 26.09.480(2).
[7] Wehr, 165 Wn. App. at 612 (citing RCW 26.09.520).
[8] Horner, 151 Wn.2d at 894-95 (quoting In re Custody of Osborne, 119 Wn. App. 133, 144-45, 79 P.3d 465 (2003)).
[9] Horner, 151 Wn.2d at 887.
[10] Wehr, 165 Wn. App. at 614.

Byron contends that this presumption has a limited purpose. It places on the opposing party the burden of producing sufficient evidence to overcome the presumption by a preponderance of the evidence. Once this occurs, the presumption disappears, and the court weighs the evidence without regard to the presumption. Implicit, but unstated, in Byron's argument is the view that rebuttal of the presumption in this manner shifts the burden of persuasion to the person requesting the move. We recently rejected a similar argument in the context of a different statutory presumption.[11]

In Larson v. City of Bellevue,[12] we held that a statutory presumption that certain diseases contracted by firefighters were occupational diseases shifted the burdens of production and persuasion. Two factors present in both Larson and this case persuade us that RCW 26.09.520 places both the burden of production and persuasion on the objecting person. First, this statute reflects a public policy decision made by the legislature favoring relocation. Second, Washington precedent requires a defined quantum of proof (preponderance) to rebut the presumption. Deciding if the evidence produced achieves the necessary level of persuasiveness requires an evaluation of witness credibility and the persuasiveness of all admitted evidence. Logically, this shifts to the objecting

---

[11] Larson v. City of Bellevue, No. 71101-6-I, 2015 WL 4204116, at *7 (Wash. Ct. App. July 13, 2015).

[12] No. 71101-6-I, 2015 WL 4204116, at *7 (Wash. Ct. App. July 13, 2015).

person the burden of persuading the court that detriment of the proposed relocation outweighs the benefit of the change to the child and relocating person.[13]

Byron cites Bank of Washington v. Hilltop Shakemill, Inc.,[14] to support his position. In Hilltop, this court held that the trial court must disregard a presumption of a community debt once the debtor presents evidence to overcome the presumption.[15] Byron argues that consistent with the provisions and policy of the CRA, the trial court should have applied the relocation presumption in the same way. He claims that retaining the presumption after the objecting person has rebutted it impermissibly elevates one parent's fundamental parenting right over that of the other parent. But this mechanical argument fails to address that the CRA's presumption of relocation "'incorporates and gives substantial weight to the traditional presumption that a fit parent will act in the best interests of her child.'"[16] As Division Two of this court has concluded, the preponderance of the evidence standard of proof required to overcome the presumption adequately protects the interests of both parents.[17]

---

[13] Larson, 2015 WL 4204116, at *6.
[14] 26 Wn. App. 943, 946, 948, 614 P.2d 1319 (1980).
[15] Hilltop, 26 Wn. App. at 948.
[16] Horner, 151 Wn.2d at 895 (quoting Osborne, 119 Wn. App. at 144).
[17] Wehr, 165 Wn. App. at 614.

Courts interpret statutory presumptions to give them the force intended by the legislature.[18] The CRA's 11 child relocation factors "serve as a balancing test between many important and competing interests and circumstances involved in relocation matters," while the presumption in favor of relocation operates to give particular importance to the interests and circumstances of the relocating parent, not only the best interests of the child.[19] The significant yet surmountable hurdle the legislature established for the opposing party supports the view that the presumption does not disappear upon a party's production of evidence. If it disappeared as suggested, the presumption would do little to further the legislature's apparent purpose of generally favoring relocation. As we apply the presumption, it provides the standard the trial court uses at the conclusion of trial to resolve competing claims about relocation. This approach furthers the legislature's policy reflected in the presumption.

RCW 26.09.520 shifts the burdens of persuasion and production to a party opposing relocation. The trial court did not err in its application of the statutory presumption.

<u>Court's Consideration of Child Relocation Factors</u>

Byron next argues that the trial court failed to consider all 11 relocation factors in RCW 26.09.520. A trial court must consider all 11 statutory factors in

---

[18] <u>Larson</u>, 2015 WL 4204116, at *7.
[19] <u>Horner</u>, 151 Wn.2d at 894.

child relocation matters to determine if a detrimental effect outweighs the benefits to both the child and the parent wishing to relocate.[20] Each factor has equal importance, and they are not weighted or listed in any order but rather provide a balancing test between the competing interests and circumstances that exist when a parent wishes to relocate.[21] The trial court must enter specific findings on each factor, or parties must have presented substantial evidence on each factor with the trial court making findings and oral articulations that reflect its consideration of each.[22] A trial court abuses it discretion when it fails to consider each factor.[23]

The trial court heard testimony from both parents and from Dr. Hutchins-Cook about the 11 relocation factors. The trial court's findings of fact and conclusions of law stated that it had "considered the factors in RCW 26.09.520, and those factors favor the mother and her preferred relocation to Texas." Because the trial court did not enter specific findings on each factor, we must determine if the court heard substantial evidence on each factor and reflected its consideration of each in its findings and oral articulations.

---

[20] Horner, 151 Wn.2d at 894-95 (quoting Osborne, 119 Wn. App. at 144-45).

[21] Horner, 151 Wn.2d at 894.

[22] Horner, 151 Wn.2d at 895-96.

[23] Horner, 151 Wn.2d at 894-95.

(1) <u>The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life</u>

Dr. Hutchins-Cook testified that A.J.M. had strong bonds with both parents, as well as her paternal grandparents and maternal grandmother. She found A.J.M. equally attached to both parents. Dr. Hutchins-Cook also found that Angelika was very good at providing care to A.J.M. and did 75-85 percent of the parenting. Byron testified at trial that he shared parenting responsibilities with Angelika and that both he and Angelika had a strong bond with A.J.M. The trial court considered this factor when it found that A.J.M.'s relationship with Angelika and her family in Texas is at least as strong as the relationship A.J.M. has with Byron and his family.

(2) <u>Prior agreements of the parties</u>

Dr. Hutchins-Cook testified that during evaluation Angelika stated she would not relocate but also testified that the parties had made no agreement.[24] This factor is inapplicable.

---

[24] Byron asserts that an agreement existed because he relied on Angelika's statements to Dr. Hutchins-Cook. But the record fails to support any agreement between the parties on this issue.

(3) Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation

Dr. Hutchins-Cook testified that at A.J.M.'s age, disrupting A.J.M.'s relationship with Angelika is more harmful than disrupting her relationship with Byron. Dr. Hutchins-Cook testified that relocation makes a significant impact on the quality of the relationship but is unlikely to break the attachment of a child to his or her parent. The trial court's finding that the strength of A.J.M.'s relationship to Angelika and her family in Texas is at least as strong as her relationship with Byron and his family reflects the court's consideration of this factor.

(4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191

Because neither party alleged harm to A.J.M. under RCW 26.09.191, the court did not need to consider this factor.

(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation

Angelika testified that she wanted to be close to her family and move to a community where she could purchase a home. Byron testified about his close relationship with A.J.M. and his strong concern about her relocation. He thought Angelika may be trying to relocate A.J.M. away from him. During cross-examination, he challenged her assertion that Texas provides a cheaper cost of

living and asserted in argument that she changed her position about moving to preclude Dr. Hutchins-Cook from evaluating the relocation issue. Angelika testified that at the time of evaluation, she believed she would not relocate because her parents sold their restaurant and were trying to buy a home in Seattle but later changed her mind when their plans failed.

The trial court addressed Byron's reasons for opposing the relocation in its order denying his motion for stay when it acknowledged that relocation may be disruptive to his relationship with his daughter. But the trial court ultimately adopted Angelika's reasoning, referencing in its order the strong bond between A.J.M. and Angelika's family in Texas, as well as opportunities for A.J.M. and Angelika there.

(6) <u>The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child</u>

Dr. Hutchins-Cook testified that both parents understood A.J.M. to be a sensitive child but that she did not believe A.J.M. had special needs. She testified that if A.J.M. remains, A.J.M. has everything she needs, including both parents. She acknowledges that if A.J.M. moves, it would disrupt her relationship with her father. The trial court's statement in its order denying Byron's motion for stay that Angelika's establishment of a "home with permanence" provided A.J.M. "stability and security" reflects the court's consideration of this factor.

-13-

(7) <u>The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations</u>

Dr. Hutchins-Cook testified that she believed A.J.M. had everything available to her in the status quo but knew nothing about Angelika's financial or housing situation. Angelika testified that she could not afford to live on Mercer Island once her lease expired, about her ability to buy a home for her and A.J.M. in Texas, and her high quality of life there compared with the less desirable lifestyle she could afford in Seattle. The trial court stated that

> [A.J.M.] can look forward to a substantially better housing by granting the motion to relocate. She can expect to enjoy the stability of residence that home ownership usually provides. The community to which Petitioner proposes to move is, by the evidence, rated highly in all categories, most particularly, in the quality of schooling to which she will have access.
>
> While Mercer Island, from which she will move, has high quality schools, she probably could not continue to reside there.

(8) <u>The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent</u>

Dr. Hutchins-Cook testified that she recommends Skype™ (Microsoft Corp. product providing video chat and voice calls from various electronic devices) or FaceTime™ (Apple Inc. product providing video chat and voice calls from various electronic devices) as a useful tool for A.J.M. to communicate with Byron. The trial court included Skype and FaceTime arrangements in its

parenting plan. Its order denying Byron's motion for stay also indicated it considered this factor:

> No one questions that the father is dedicated to his child, and she to her father. To the extent that the relocation is disruptive to that relationship, he is in the better position to ameliorate the negative aspects of their separation, by his regular and consistent contact with her, than by denying the benefits to her of the relocation. He does have the resources, and apparently the intent, to continue to see his daughter in Texas, where he, too, has family and roots.

(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also

Angelika testified that while she had always considered relocating, she had tried to stay in Seattle when her parents attempted to move to Seattle. Byron testified that he could not relocate to Texas due to logistical, financial, and professional constraints. The trial court's order reflects its consideration of this factor, finding that Angelika likely was unable to continue living on Mercer Island and would not be able to provide A.J.M. access to desirable resources.

(10) The financial impact and logistics of the relocation or its prevention

Angelika testified that Texas had cheaper housing prices and less expensive activities for A.J.M. In cross-examination, Byron challenged these assertions. The trial court stated in its order that Angelika probably could not continue living on Mercer Island, while in Texas A.J.M. could look forward to substantially better housing.

(11) <u>For a temporary order, the amount of time before a final decision can be made at trial</u>

This is not applicable to this court's analysis.

The trial court wrote in conclusion, "Considering all the factors of RCW 26.09.520, the very substantial weight of the evidence supports granting Petitioner's motion." Thus, we conclude that the court's findings reflect that it properly considered each of the applicable factors under RCW 26.09.520.

<u>Abuse of Discretion</u>

Byron contends that he demonstrated harm under RCW 26.09.520, reciting his evidence addressing each factor, while arguing that Angelika did not meet her burden. But as Angelika contends, Byron's argument asks this court to reexamine the evidence and reach a different conclusion than the trial court, misapprehending this court's role. We do not review credibility determinations or reweigh the evidence to determine if we should reach a different conclusion, as Byron's argument implies.[25] We review instead for abuse of discretion.[26]

Byron contends that the court should not have looked at Angelika's close relationship with her family. This ignores the trial court's obligation to consider her interests under RCW 26.09.520.[27] He further claims that Angelika waived the protections of RCW 26.09.530 and that the trial court failed to consider that she

---

[25] See In re Marriage of Fahey, 164 Wn. App. 42, 62, 262 P.3d 128 (2011); see also Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003).
[26] Chandola, 180 Wn.2d at 642.
[27] Horner, 151 Wn.2d at 894.

-16-

would not relocate unless the court allowed A.J.M.'s relocation. But this is not a mandatory factor under RCW 26.09.520, and the court had discretion not to examine that issue. Byron further asserts the court erred as a matter of law when it considered Angelika's interest in buying a home. RCW 26.09.520 permits considering this as a potential benefit to a relocation.

Sufficient evidence supports the court's relocation decision. Angelika testified that when she told Dr. Hutchins-Cook she would not relocate, she based this on the fact that her parents had moved to Seattle. It is important for her to be near her family. When her parents returned to Texas, she had no family in Seattle. She testified, "[I]t's hard to be away from them, especially right now." Angelika also has friends in Texas and goes back about every six months. And she felt she had no support from Byron's family. Angelika also testified that purchasing a home is important to her and she would be able to do so in Texas, where houses cost less than in Seattle. She testified that A.J.M. could participate in activities at less cost in Texas than in Seattle. In Seattle, Angelika could not save money. Angelika believes A.J.M. should relocate with her because she has provided a majority of the care and A.J.M. goes to her for comfort, guidance, love, and affection. Dr. Hutchins-Cook testified that a relocation does not break attachment between an infant or toddler and his or her long-distance parent, but the quality of the relationship is not as good as when a

parent has regular, frequent contact. Dr. Hutchins-Cook testified that at A.J.M.'s age, greater harm would likely come to A.J.M. through disruption of her relationship with her mother than disruption of the relationship with her father.

Thus, we conclude that because the evidence at trial and the trial court's findings reflect its consideration of all 11 child relocation factors and because sufficient evidence supported the trial court's conclusion that upon consideration of those factors it should grant the relocation, the trial court did not abuse its discretion.

Challenged Terms in Parenting Plan

Byron challenges several terms of the parenting plan fashioned by the trial court, arguing that the trial court failed to support its findings of fact with substantial evidence, leading to improper parenting plan terms. But, as Angelika argues, a trial court need not support each term of a parenting plan with specific factual findings. Rather, a trial court has broad discretion to structure a parenting plan, guided by the provisions of the applicable statutes.[28] We look at each challenged term, reviewing for abuse of discretion.

Byron first contends that the trial court abused its discretion when it ordered that Byron could not designate other caretakers. Angelika clarifies that

---

[28] Katare, 175 Wn.2d at 35-36.

the restriction does not limit Byron's ability to leave the child with others but simply limits his ability to allocate his entire time to another person.

Ordinary parental decision-making rights include designating family members to care for one's child.[29] A trial court may impose restrictions on parental rights under RCW 26.09.191. But "[a] trial court abuses its discretion if it imposes a restriction that is not reasonably calculated to prevent . . . a harm" "similar in severity to the harms posed by the 'factors' specifically listed in RCW 26.09.191(3)(a)-(f)."[30]

The trial court found that "[t]his is father's time to be with the child; he cannot delegate the time to his family, other than when he is physically present in Texas, unless agreed upon between the parents." But, as Byron argues, in this case the trial court did not impose any restrictions under RCW 26.09.191. Byron analogizes to In re Marriage of Chandola,[31] a case decided after the trial court's decision in this case. There, the trial court imposed a restriction limiting the paternal grandparents' contact with the child to 20 percent of the father's residential time to encourage the father to directly parent.[32] But the Washington Supreme Court held that absent findings of harm to the child under RCW

---

[29] In re Marriage of Magnusson, 108 Wn. App. 109, 110-11, 29 P.3d 1256 (2001).
[30] Chandola, 180 Wn.2d at 648.
[31] 180 Wn.2d 632, 327 P.3d 644 (2014).
[32] Chandola, 180 Wn.2d at 641.

26.09.191, those necessary to prevent mental, physical, or emotional harm to the child, the court abused its discretion.[33]

In In re Marriage of Magnusson,[34] this court affirmed a trial court's parenting plan that had a provision allowing a fisherman father to designate time to his parents during his absence. Angelika attempts to distinguish Magnusson, arguing that in that case the father had regular residential time and required daycare, where here, if Byron does not go to Texas, then he is not entitled to the time at all. Angelika also argues that allowing Byron to delegate his residential time to a family member conflicts with the U.S. Supreme Court's decision in Troxel v. Granville,[35] protecting parental rights against those of third parties.

We disagree with Angelika's understanding of Magnusson and Troxel. Byron does have regular residential time with A.J.M. should he choose to use it. And a court presumes that a fit parent acts in the best interests of his or her children.[36] Magnusson distinguishes Troxel as a case about the competing rights of parents and nonparents. Here, as in Magnusson, where wishes conflict only between two parents, "[i]n the absence of a finding that spending time with . . . relatives was against [a child's] best interests," a parent designating time

---

[33] Chandola, 180 Wn.2d at 658-59.
[34] 108 Wn. App. 109, 111, 113, 29 P.3d 1256 (2001).
[35] 530 U.S. 57, 69-70, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).
[36] Troxel, 530 U.S. at 69.

to relatives "simply confirms a normal right of parental decision making."[37] Because no evidence supports the challenged limitation and because the trial court found Byron a competent parent who can take care of A.J.M. and make decisions on her behalf, we conclude that this limitation constitutes an abuse of discretion.

Byron contends that the trial court abused its discretion when it required him to provide a 45-day notice to Angelika for his monthly visits, a 60-day notice after A.J.M. begins school, and an 8-month notice for winter break travel plans. Angelika testified that 30 days is reasonable notice. Dr. Hutchins-Cook testified, however, that a 15- to 30-day notice is reasonable but that a 60-day notice is unreasonable and too long. Because no evidence supports the trial court's notice requirements, the trial court abused its discretion imposing them.

Byron next contends that the trial court abused its discretion when it concluded that until age 18 A.J.M. may not spend more than three to four days with Byron without interruption by Angelika. If true, his contention might have merit. But Byron has misinterpreted the trial court's residential schedule.

Before A.J.M. reaches school age, the trial court provided Byron a five-day monthly residential schedule. After A.J.M. reaches school age, the residential schedule provides him seven days per month, interrupted by an overnight with

---

[37] Magnusson, 108 Wn. App. at 113.

Angelika. But the schedule provides different terms for A.J.M.'s winter vacation, other school breaks, and summer vacation. The trial court divides A.J.M.'s winter holiday break in two parts and requires an interruption of Byron's time with A.J.M. only if Angelika travels to Washington with A.J.M. The trial court's parenting plan provides no interruptions when Byron has A.J.M. for her midwinter or spring breaks, when A.J.M. may visit Washington after she begins school. And the trial court imposed a progressive schedule for A.J.M.'s summer vacation. Until A.J.M. turns five and begins school, Byron may have her for up to 10 days and only when Angelika brings A.J.M. to Washington must there be a designated break in the middle. After A.J.M. turns five and begins school but before she turns seven, Byron may have her for two weeks without interruption. And after A.J.M. turns seven, during her summer vacation Byron may have her for an uninterrupted four weeks. And Angelika admits in her appellate brief to this court that she "has no objection, 3-4 years out, to not having the father's time with [A.J.M.] interrupted by the mid-period return to her" under the court's order.

Because the trial court fashioned a schedule tailored to A.J.M.'s age that provides Byron significant time with his daughter in Washington, we conclude that the trial court did not abuse its discretion when fashioning the terms of the parenting plan's residential schedule.

Byron further contends that the trial court arbitrarily imposed a restriction in the parenting plan limiting Byron's holiday visits in Texas to the day of the holiday between the hours of 10:00 a.m. and 8:00 p.m. He argues that it serves no purpose other than to limit A.J.M.'s ability to see him. But Byron may schedule his residential time in Texas to include major holidays. And the trial court's schedule for other special occasions, though limited to one day, reflects the court's reasonable allocation of these days to both Angelika and Byron, so each can celebrate with A.J.M. without disrupting A.J.M.'s schedule. Thus, we conclude that the trial court did not abuse its discretion when limiting special occasions to a single day.

Byron also contends that the trial court abused its discretion by arbitrarily limiting his video chat time with his daughter to one to two times per week when no evidence in the record supported that limitation. But because this provides him semiregular contact with A.J.M. and avoids burdening Angelika with scheduling more frequent contact while she provides childcare and implements schedules, we conclude that this is a reasonable parenting plan term and within the trial court's discretion.

Split of Travel Expenses

Byron argues that the trial court abused its discretion when it ordered a proportional split of airfare alone, leaving Byron responsible for additional

expenses associated with his trips to Texas, including room and board and car rental. RCW 26.19.080(3) states that long-distance travel costs "to and from the parents for visitation . . . shall be shared by the parents in the same proportion as the basic child support obligation." A trial court must apportion these costs.[38]

Angelika argues that the statute's plain language defines the proportional travel expense to include merely airfare and not the cost of living while with a child. An appellate court does not construe a statute's unambiguous language.[39] Here, RCW 26.19.080(3) explicitly requires allocation of travel expenses incurred "to and from" the location and not all costs associated with long-distance visitation.

Additionally, a trial court has discretion to decide what travel expenses are necessary and reasonable.[40] In this case, evidence supports the trial court's conclusion that expenses above airfare were not necessary and reasonable. Byron testified that he has a brother living in Texas, though the brother planned to move to Seattle in January 2015. Byron also testified that he did not think it would be possible for A.J.M. and him to stay with his sister who lives with her boyfriend near Angelika's proposed town of relocation. But Angelika testified that Byron and his siblings remained close, that he had previously stayed with his

---

[38] In re Paternity of Hewitt, 98 Wn. App. 85, 89, 988 P.2d 496 (1999).
[39] In re Marriage of Scanlon, 109 Wn. App. 167, 172, 34 P.3d 877 (2001).
[40] Hewitt, 98 Wn. App. at 89.

brother, and that Byron could potentially stay with his family during visits to see A.J.M. Because Byron has family in Texas and the trial court could have found that air travel was the only necessary and reasonable travel expense, the trial court did not abuse its discretion when it ordered a proportional division of costs for airfare alone.

Attorney Fees

Byron finally argues that the trial court abused its discretion when it awarded Angelika "a portion of her reasonable attorney fees and costs" under RCW 26.09.140 in the amount of $15,000. RCW 26.09.140 allows a trial court to award attorney fees after consideration of the financial resources of each party. A court awards attorney fees under the statute based on need and ability to pay; even if one party has a need, a trial court does not award the fee if the other party does not have the ability to pay.[41]

Byron argues he had no ability to pay, that each party received an equal division of property, and that the maintenance award substantially equalized the parties' respective net incomes. But Byron testified to earning an annual salary of $140,000, with a monthly net income of $8,295. He believed his income would grow perhaps by as much as nearly $4,000 per month that year. His monthly expenses total $5,694. Byron's maintenance obligation to Angelika is $2,250 per

---

[41] RCW 26.09.140; In re Marriage of Schnurman, 178 Wn. App. 634, 644-45, 316 P.3d 514 (2013), review denied, 180 Wn.2d 1010 (2014).

month for 36 months. He is also responsible for $841 in child support payments during maintenance and $1,053 in child support payments after maintenance.

Angelika testified that she makes $40,000 per year and had spent $30,000 of her savings in attorney fees, with $40,000 remaining in her savings account. Because of the disparity between Angelika's and Byron's income and earning potential, with Byron far better situated financially, we conclude that the trial court did not abuse its discretion when it awarded reasonable attorney fees and costs to Angelika.

Angelika requests attorney fees under RAP 18.1. Byron objects on the grounds that Angelika did not properly brief the issue. Because Angelika does not devote any argument to the issue, we deny fees under RAP 18.1.

## CONCLUSION

Because the relocation presumption shifts the burdens of production and persuasion, the trial court properly applied the presumption. Because the court heard testimony on the RCW 26.09.520 relocation factors and reflected its consideration of the factors in its findings, the court did not abuse its discretion. Because substantial evidence supports the trial court relocation decision, we affirm it. Because a parent may delegate its residential time to family members absent any indication of harm to a child, the trial court abused its discretion by denying Byron this discretion. Because no evidence supports the parenting plan

notice requirement, the trial court abused its discretion fashioning these terms. But because a court has broad discretion to fashion a parenting plan, we conclude that the remaining challenged terms fall within the trial court's discretion. Because RCW 26.19.080(3) requires a mandatory proportional split of travel expenses to and from a location and Byron's brother and sister live near Angelika's relocation destination, we conclude that the trial court reasonably required a split for airfare and no other travel expenses. And because evidence reflects that Byron earns more than Angelika and Angelika spent significant savings on attorney fees, the trial court did not abuse its discretion by awarding Angelika attorney fees. We decline to award attorney fees under RAP 18.1. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

_Leach, J._

WE CONCUR:

_Spearman, C.J._     _Schindler, J._