# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Parenting and Support of: | No.  49112-5-II |
| E.L.C., | |
| Child. | |
| JAMES M. CHILDS, | |
| Petitioner, | UNPUBLISHED OPINION |
| and | |
| OLIVIA N. WALTON, | |
| Respondent. | |

JOHANSON, J. — James Childs appeals the trial court's final parenting plan regarding his and Olivia Walton's child, ELC. Childs argues that a factual finding was not supported by substantial evidence, that the trial court abused its discretion, and that the final parenting plan violated his constitutional rights. We disagree and affirm.

## FACTS

### I. BACKGROUND

ELC was born to Walton and Childs in June 2014. Shortly after ELC's birth, Walton moved out from the home where she lived with Childs, taking ELC, and discontinued contact with Childs. In October, Childs filed a petition to establish a parenting plan.

In February and July 2015, the trial court entered temporary orders that designated Walton as ELC's "custodian" for "all other state and federal statutes" and provided that ELC would reside with Walton for the majority of the time. Clerk's Papers (CP) at 10, 35. The February temporary parenting plan provided for ELC to reside with Walton except for two weekly four- or six-hour periods when ELC was with Childs. The July temporary parenting plan increased Childs's residential time to 4 hours during the week and a 32-hour, overnight visit on the weekend. Both temporary orders prohibited Childs from being under the influence of drugs or alcohol during the visits and required him to provide Walton with urinalysis results and treatment attendance records, establishing that he was in treatment.

## II. FINAL PARENTING PLAN PROCEEDINGS

### A. BENCH TRIAL

The matter proceeded to a bench trial, at which Walton requested sole decision-making authority and to maintain the existing residential schedule and Childs requested equal decision-making authority and an equal residential schedule. In support of his request, Childs relied upon RCW 26.16.125 and arguments that failure to adopt his proposed parenting plan would violate his constitutional rights.

1. CHILDS'S TESTIMONY

Childs testified that Walton excluded him from decision making about ELC and tried to control his access to ELC. During his testimony, Childs discussed his criminal history: in 2001, he pleaded guilty to the felony of conspiracy to commit robbery. In 2014, he pleaded guilty to first degree negligent driving, which was reduced from a driving under the influence (DUI) charge. Within one year, he received a deferred prosecution for another DUI charge. To obtain the deferred

prosecution, Childs had admitted to his "alcoholism" having caused the wrongful conduct; however, Childs testified that he had lied about being an alcoholic and that he did not in fact suffer from alcoholism.

2.      WALTON'S TESTIMONY

Walton testified that she moved out from Childs's home because she felt uncomfortable and stressed living with Childs. She felt threatened and bullied by "[a]ll of the litigation" Childs had since initiated regarding ELC.[1]  Verbatim Report of Proceedings (VRP) at 181.

Walton disputed that she and Childs could make decisions together or agree about "anything." VRP at 197-98.  For instance, they could not agree on health-care decisions regarding ELC because Childs disagreed with placing ELC on state insurance or vaccinating her.  Walton also testified that if the trial court ordered joint decision making, that would result in a decision-making impasse between her and Childs.  She explained that when she had sole decision-making authority, Childs was unable to force her to give in, argue with her, and bully her.

Walton did acknowledge that she and Childs had mutually decided for ELC to participate in soccer.  She, Childs, and ELC had also gone out together at least twice.

Walton claimed that although the temporary parenting plans required Childs to provide her with random urinalysis results and treatment records, Childs had ceased doing so.  However, Walton admitted that she had never "seen one that wasn't clean." VRP at 191.

---

[1] During his testimony, Childs acknowledged that he had filed over 100 pleadings in the case.

3.      FINAL PARENTING PLAN RULING

Following the parties' testimony, the trial court orally ruled[2] that it would adopt Walton's proposed parenting plan. The trial court expressed two primary areas of concern that impacted its determination of the appropriate parenting plan but that did not rise to the level of former RCW 26.09.191 (2011) limitations.

First, the trial court found that Childs had two alcohol-related offenses within 12 months of each other. It expressed "great concern that [Childs] ha[d] these back-to-back alcohol-related offenses" in addition to his guilty plea related to conspiracy to commit robbery. VRP at 228. And the trial court found a lack of information about "what progress [Childs had] made in treatment" due to the dearth of records. VRP at 229. Because of this lack of information, the trial court could not discern whether Childs "acknowledged this problem and dealt with it." VRP at 229.

Second, the trial court found "abundant" evidence "that there's just no ability [of the parents] really to agree." VRP at 229. It referenced Childs's bullying Walton, which the trial court perceived as an effort to make Walton "give in." VRP at 229. Later, when the trial court orally ruled that it would allocate sole educational and nonemergency health care decision-making authority to Walton, it also noted the evidence about "the history of these parties, the attempts to control, [and] the history of litigation in this matter." VRP at 231.

The trial court entered a final parenting plan in which ELC spent the majority of the time with Walton. Like the July temporary parenting plan, the final parenting plan provided for ELC

---

[2] The trial court entered written findings adopting the final parenting plan and stating that no former RCW 26.09.191 limitations applied. However, the trial court did not include written findings for the RCW 26.09.187 parenting plan criteria.

to spend a 4-hour period during the week and a 32-hour, overnight period during the weekend with Childs. Walton was also designated ELC's custodian "for purposes of all other state and federal statutes which require a designation or determination of custody." CP at 107. Regarding decision-making authority, the trial court allocated decision-making authority about religious upbringing to both parents. However, the trial court allocated educational and nonemergency health care decision-making authority to Walton.

Childs had to abstain from alcohol or illegal drugs before and during visits, comply with "all provisions of his Deferred Prosecution treatment and probation," and release urinalysis results and monthly treatment attendance records to Walton. CP at 107.

Childs appeals the trial court's final parenting plan.

## ANALYSIS

### I. CHALLENGED FINDING SUPPORTED BY THE EVIDENCE

Childs challenges the trial court's factual finding about his lack of treatment progress.[3] We hold that substantial evidence supports the challenged finding.

Factual findings made by the trial court when it fashions a parenting plan are reviewed for substantial evidence. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). "Substantial evidence is that which is sufficient to persuade a fair-minded person of the truth of the matter asserted." *Katare*, 175 Wn.2d at 35.

Related to Childs's offenses involving alcohol, the trial court found that there was no evidence or records to show that Childs had "acknowledged this problem and dealt with it." VRP

---

[3] Walton did not file a respondent's brief.

at 229.  At trial, there was no documentation of Childs's treatment progress.  Walton testified that Childs had ceased providing her with urinalysis results and monthly treatment records even though the temporary parenting plans required Childs to do so.  Thus, the record contains substantial evidence to support the finding that Childs failed to provide evidence of treatment progress.  *See Katare*, 175 Wn.2d at 35.

Childs relies upon Walton's testimony that she had never seen a urinalysis result that "wasn't clean."  VRP at 191.  This argument fails for two reasons.  First, even if the urinalysis results that Walton had seen were clean, this did not establish that all of Childs's urinalysis results were clean because Walton also testified that Childs did not provide her with all the required urinalysis results.  Second, clean urinalysis results alone did not establish compliance with "treatment," which included attending treatment.  CP at 34.  We hold that substantial evidence supports the finding of lack of treatment progress evidence and reject Childs's argument to the contrary.

## II.  NO ABUSE OF DISCRETION

Childs advances three primary arguments that the trial court abused its discretion when it fashioned the permanent parenting plan.  We address and reject these arguments in turn, below.

### A.  LEGAL PRINCIPLES

We review a trial court's fashioning of a final parenting plan for an abuse of discretion; the trial court's discretion in this area is "broad."  *Katare*, 175 Wn.2d at 35.  "'A court's decision is . . . based on untenable reasons if it is based on an incorrect standard.'"  *In re Marriage of Horner*, 151 Wn.2d 884, 894, 93 P.3d 124 (2004) (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)).  We do not reweigh the evidence to determine if we would reach a different

conclusion. *In re Marriage of McNaught*, 189 Wn. App. 545, 561, 359 P.3d 811 (2015), *review denied*, 185 Wn.2d 1005 (2016).

"The trial court must make a residential placement decision in the best interests of the child and only after considering the factors found in RCW 26.09.187(3)." *In re Parentage of J.H.*, 112 Wn. App. 486, 492-93, 49 P.3d 154 (2002). RCW 26.09.187(3) sets forth the criteria when formulating residential provisions in a permanent parenting plan:

> (a) The court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances. The child's residential schedule shall be consistent with RCW 26.09.191. Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule, the court shall consider the following factors:
>
> (i) The relative strength, nature, and stability of the child's relationship with each parent;
>
> (ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
>
> (iii) Each parent's past and potential for future performance of parenting functions as defined in [RCW 26.09.004(2)],[4] including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
>
> (iv) The emotional needs and developmental level of the child;
>
> (v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
>
> (vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and
>
> (vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

---

[4] These are "those aspects of the parent-child relationship in which the parent makes decisions and performs functions necessary for the care and growth of the child," including "[m]aintaining a loving, stable, consistent, and nurturing relationship with the child"; "[a]ttending to [the child's] daily needs" and engaging in other appropriate activities; "[a]ttending to adequate education for the child"; "[a]ssisting the child in developing and maintaining appropriate interpersonal relationships"; "[e]xercising appropriate judgment regarding the child's welfare," and "[p]roviding for the [child's] financial support." RCW 26.09.004(2).

Factor (i) shall be given the greatest weight.

## B.  CRIMINAL HISTORY

Childs argues that the trial court abused its discretion when it determined the final parenting plan because the trial court expressed concern over Childs's criminal history yet granted overnight visitation between himself and ELC.  He claims that the trial court's determination was inconsistent with its expressed concern about his criminal history and thus that the trial court's concern was not genuine.  We reject Childs's arguments.

When the trial court made its oral ruling, it began by noting that both of ELC's parents loved and cared about ELC.  However, the trial court expressed concern over Childs's criminal history, particularly his two alcohol-related offenses, as well as his failure to document his treatment progress and Childs's and Walton's inability to make decisions together.  Childs's criminal history—which included two alcohol-related offenses within one year of each other— was a factor that bore on his continued ability to perform parental functions.  *See* RCW 26.09.187(3)(a)(iii).  His criminal history was also relevant to ELC's best interests.  Childs's criminal history was thus properly considered as part of the final parenting plan determination. *See* RCW 26.09.187(3)(a)(iii); *J.H.*, 112 Wn. App. at 492-93.

Childs asserts that if the trial court genuinely believed his criminal history was relevant, then residential placement with Childs was an all-or-nothing proposition.  Childs provides no Washington authority in support of his argument,[5] and we disagree with him.  Rather, as part of

---

[5] Childs relies on an out-of-state case, *Wade v. Wade*, 124 So.3d 369, 38 Fla. L. Weekly D2222 (2013), throughout his brief.

its "broad discretion" in fashioning the permanent parenting plan, *Katare*, 175 Wn.2d at 35, the trial court had the authority to determine the best residential schedule under the circumstances.

Here, the trial court determined the residential schedule by balancing findings disfavoring residential time, including Childs's criminal history and apparently untreated alcohol problem, as reflecting an inability to perform parental functions, against factors favoring residential time, including his bond with ELC. The trial court determined that the best residential schedule under the circumstances involved ELC spending some residential time with Childs but more time with Walton. In doing so, the trial court did not abuse its broad discretion.

### C. LACK OF WRITTEN FINDINGS OR FORMER RCW 26.09.191 LIMITATIONS

Childs briefly argues that it was error for the trial court to limit his residential time with ELC without making written findings or finding the existence of any former RCW 26.09.191 limiting factors. Similarly, Childs argues that it was error to allocate educational and nonemergency health care decision-making authority to Walton without making written findings or finding former RCW 26.09.191 limiting factors. We disagree with these arguments.

1. RESIDENTIAL PROVISIONS: NO WRITTEN FINDINGS AND NO FORMER RCW 26.09.191 LIMITATIONS

When establishing a parenting plan, a trial court is not required to enter written findings on each RCW 26.09.187(3)(a) criterion. *In re Marriage of Magnuson*, 141 Wn. App. 347, 351, 170 P.3d 65 (2007). Former RCW 26.09.191 provides for a trial court to enter limitations on a parent's residential schedule if it finds the existence of one or more of certain factors. Regarding the interplay of former RCW 26.09.191's limitations and the permanent parenting plan criteria in RCW 26.09.187, the Supreme Court has stated,

There is some overlap between the trial court's authority under RCW 26.09.187, to establish the terms of the parenting plan, and its authority under RCW 26.09.191(3), to "preclude or limit any provisions of the parenting plan." *Practically speaking, a court can substantially restrict a parent's contact with his or her child simply by establishing a residential schedule pursuant to its discretion under RCW 26.09.187.*

*In re Marriage of Chandola*, 180 Wn.2d 632, 644, 327 P.3d 644 (2014) (emphasis added) (quoting RCW 26.09.191(3)).

The trial court's written findings did not include findings under the RCW 26.09.187(3)(a) criteria. Because failure to enter written findings on each criterion under RCW 26.09.187(3)(a) is not an abuse of discretion, Childs's argument that failure to enter written findings was an abuse of discretion fails. *Magnuson*, 141 Wn. App. at 351.

The trial court did enter a written finding that no former RCW 26.09.191 limitations applied. However, the trial court had the authority to limit Childs's residential time with ELC by establishing a permanent parenting plan under RCW 26.09.187(3), even if the trial court found no former RCW 26.09.191 limitations. *See Chandola*, 180 Wn.2d at 644. Childs's argument that the trial court abused its discretion because it could not unequally allocate the parents' residential time without first finding an applicable former RCW 26.09.191 limitation fails.

Childs fails to establish that the trial court abused its discretion either when it did not enter written findings under RCW 26.09.187(3)(a) or when it limited his residential time with ELC despite failing to find that any former RCW 26.09.191 limitations existed.

2.    DECISION-MAKING AUTHORITY:  NO WRITTEN FINDINGS AND NO FORMER RCW
      26.09.191 LIMITATIONS

If the trial court's written factual findings do not clearly reflect consideration of the statutory factors, we may look to the oral ruling.  *Young v. Thomas*, 193 Wn. App. 427, 443, 378 P.3d 183 (2016).

Under RCW 26.09.187(2)(b)(iii), if the trial court finds that one parent is opposed to mutual decision making and that the opposition is reasonable based upon the criteria in RCW 26.09.187(2)(c), the trial court must order sole decision making.  The RCW 26.09.187(2)(c) criteria include the existence of any former RCW 26.09.191 limitations; each parent's history of decision-making participation in the areas of education, health care, and religious upbringing, and the parents' demonstrated ability and desire to cooperate in the areas of education, health care, and religious upbringing.  RCW 26.09.187(2)(c)(i)-(iii); *see* RCW 26.09.184(5)(a).

Here, the trial court did not make a *written* finding under RCW 26.09.187(2) before allocating sole decision-making authority on nonemergency health care and education to Walton.  Childs argues that this was an abuse of discretion but provides no Washington authority requiring a written finding under RCW 26.09.187(2).  Indeed, no published Washington case has addressed this issue.

We disagree that a written finding is required in order to allocate sole decision-making authority to one parent under RCW 26.09.187(2).  RCW 26.09.187(2) does not expressly require a written finding before allocating sole decision-making authority.  Further, generally under RCW 26.09.187, we may look to the trial court's oral ruling where it did not enter written factual findings.  *See Young*, 193 Wn. App. at 443.  Here, the trial court explicitly referenced RCW 26.09.187(2)(b)(iii) in its oral ruling and found that that subsection applied based on Walton's

opposition to mutual decision making and "the history of these parties, the attempts to control, the history of litigation in this matter." VRP at 231. Because the trial court made an explicit oral finding that RCW 26.09.187(2)(b)(iii) applied and because no authority requires a written finding, we hold that failure to enter a written finding under RCW 26.09.187(2)(b) was not an abuse of discretion.

As to Childs's argument that the trial court had to find a former RCW 26.09.191 limitation before authorizing sole decision-making authority, his argument fails based on RCW 26.09.187(2)'s language. Finding a former RCW 26.09.191 limitation is just one justification for sole decision-making authority under RCW 26.09.187(2)(c). *See* RCW 26.09.187(2)(c)(i). Crucially here, other justifications are each parent's history of decision making regarding education, religious upbringing, or health care, and the parents' demonstrated ability and desire to cooperate in decision making in these areas. RCW 26.09.187(2)(c)(ii)-(iii).

Here, there was evidence to support that mutual decision making would result in an impasse based on the parents' history of decision making and the testimony that Childs attempted to bully Walton into submission using litigation and that joint decision making was the exception rather than the rule for Childs and Walton. The trial court properly relied upon this evidence as the basis for allocating sole educational and nonemergency health care decision-making authority to Walton. *See* RCW 26.09.187(2)(c)(ii)-(iii). We reject Childs's argument that in doing so, the trial court abused its discretion.

D. STATUTORY EQUAL CUSTODY

Childs argues that the trial court abused its discretion because it applied an improper legal standard by failing to rule that RCW 26.16.125 controlled. We disagree.

In the chapter dealing with community property rights and liabilities, RCW 26.16.125 provides,

> *Henceforth the rights and responsibilities of the parents in the absence of misconduct shall be equal*, and one parent shall be as fully entitled to the custody, control and earnings of the children as the other parent, and in case of one parent's death, the other parent shall come into full and complete control of the children and their estate.

(Emphasis added.) This statute means that "in the absence of a court order," both parents share the right to custody of their child, even if the parents are living apart. *State v. LaCaze*, 95 Wn.2d 760, 763, 630 P.2d 436 (1981); *see also Sanges v. Sanges*, 44 Wn.2d 35, 38, 265 P.2d 278 (1953) (parents have equal obligations to their minor child in the absence of a divorce decree).

Childs provides no Washington authority to support his argument that RCW 26.16.125 provides a statutory right to equal custody that takes priority over the best interests of the child and the criteria set forth in RCW 26.09.187(3). In fact, the Supreme Court has stated that a court order—such as a final parenting plan—controls over RCW 26.16.125. *See LaCaze*, 95 Wn.2d at 763; *Sanges*, 44 Wn.2d at 38. In light of this authority, Childs's argument fails.

Further, we have already examined RCW 26.16.125 in the context of a divorce action, where we affirmed a decision that did not subordinate the children's best interests to RCW 26.16.125. *See Weber v. Weber*, 6 Wn. App. 722, 725-26, 496 P.2d 576 (1972). There, we cited to RCW 26.16.125 as giving both parents an equal right to child custody, so that during the parents' marriage, both the mother and father had the right to custody of their children. *Weber*, 6 Wn. App. at 725. Nevertheless, we affirmed a ruling that granted custody to the children's mother following the parties' divorce. In doing so, we recognized that the "paramount interest" was the children's welfare. *Weber*, 6 Wn. App. at 726.

13

If, as Childs contends, the statutory right to equal custody controlled over the best interests of the child standard and the parenting plan criteria statute, RCW 26.09.187, then we would not have affirmed the custody determination in *Weber*. But the *Weber* decision shows that RCW 26.16.125 does not mandate "equal time" for both parents when it mandates equal rights to custody. Rather, when making a residential placement, the trial court must look to the best interests of the child and should not consider RCW 26.16.125 as controlling.

We reject Childs's argument that by failing to apply RCW 26.16.125, the trial court applied the wrong legal standard. The trial court did not abuse its discretion. *See Horner*, 151 Wn.2d at 894.

### III.  CONSTITUTIONAL RIGHTS

Childs advances two arguments that the application of the best interests of the child standard or of RCW 26.09.187, setting forth the criteria for entry of a final parenting plan, violated his constitutional rights. We reject these arguments as set forth below.

### A.  RIGHT TO INTIMATE ASSOCIATION

First, Childs argues that in order to subordinate his right to "intimate association" with ELC to ELC's best interests, strict scrutiny had to be satisfied. That is, he claims that the trial court had to identify a compelling state interest and enter a ruling that was narrowly tailored using the least restrictive means. We reject this argument, which is contrary to law.

We review de novo whether a statute violates the constitution. *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57, 109 P.3d 405 (2005). The Fourteenth Amendment of the United States Constitution guarantees the freedom of intimate association, which includes the

fundamental liberty interest in the care, custody, and management of one's child. *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

Washington cases have applied strict scrutiny analysis to discern whether third-party visitation rights infringe upon a biological parent's fundamental liberty interest in the care, custody, and control of his child. *In re Parentage of L.B.*, 155 Wn.2d 679, 709-10, 122 P.3d 161 (2005). However, "[n]o case has ever applied a strict scrutiny analysis in cases weighing the competing interests of *two parents*. Rather, in Washington, courts attempt to discern the best interests of the child." *L.B.*, 155 Wn.2d at 710.

Under *L.B.*, the best interests of the child standard applied to the dispute between Walton and Childs. 155 Wn.2d at 710. Childs relies upon cases holding that interference with a substantive due process right must satisfy strict scrutiny. But he fails to provide any cases dealing with a dispute over a residential schedule between two biological parents. *See Washington v. Glucksberg*, 521 U.S. 702, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997); *Reno v. Flores*, 507 U.S. 292, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992); *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965).

Childs also relies upon *Troxel* and *In re Custody of Smith*, 137 Wn.2d 1, 969 P.2d 21 (1998), as holding that strict scrutiny must be satisfied before the state may interfere with a parent's fundamental rights. Again, these cases are inapposite because they do not concern custody disputes between two biological parents. *See Troxel*, 530 U.S. at 61; *Smith*, 137 Wn.2d at 7. Neither case is a reason to depart from the rule that the best interests of the child standard governs disputes between those in equivalent parental positions. *See L.B.*, 155 Wn.2d at 710.

Finally, Childs appears to argue that *Munoz v. Munoz*, 79 Wn.2d 810, 814, 489 P.2d 1133 (1971), holds that a trial court abuses its discretion if it interferes with his right to custody and care of his child without an affirmative showing of a compelling reason for such action. But *Munoz* involved restraining a parent from exposing the child to the parent's religious beliefs and practices, invoking constitutionally protected religious freedoms. 79 Wn.2d at 812. Unlike *Munoz*, here, Childs does not argue that any liberty interest other than his fundamental liberty interest in parenting his child was violated. *Munoz* is inapposite here; rather, the proper rule is that in weighing ELC's biological parents' competing interests, ELC's best interests were paramount. *See L.B.*, 155 Wn.2d at 709-10.

Childs fails to show that his constitutional right to the care, custody, and control of ELC and hence his right of intimate association was violated when the trial court applied the best interests of the child standard.

## B. EQUAL PROTECTION

Second, Childs argues that the application of RCW 26.09.187 violates equal protection because it treats legally separated parents less favorably than married parents with regard to the exercise of their fundamental right to care for, have custody of, and control their child. His claims derive from his argument that disparate treatment of legally separated parents, compared to nonlegally separated parents, requires a compelling state interest. Again, we disagree.

The equal protection clause guarantees that similarly situated persons are treated alike with respect to a legitimate purpose of the law. *In re Interest of J.R.*, 156 Wn. App. 9, 20, 230 P.3d 1087 (2010) (citing *State v. Manussier*, 129 Wn.2d 652, 672, 921 P.2d 473 (1996)). But no equal protection claim will stand unless the complaining person first establishes that he is similarly

situated to those who are treated differently. *J.R.*, 156 Wn. App. at 20 (quoting *State v. Handley*, 115 Wn.2d 275, 289-90, 796 P.2d 1266 (1990)).

The parenting plan statutes aim to ensure that parents have a well thought-out working document by which to address their child's future needs and ultimately to protect their child's best interests. *In re Marriage of Possinger*, 105 Wn. App. 326, 335-36, 19 P.3d 1109 (2001). With respect to these legitimate purposes of RCW 26.09.187, Childs, as a separated parent, is not similarly situated to parents who are not legally separated. Legally separated parents require a document to address their child's future needs. Parents who are not legally separated can ostensibly reach a mutual decision and do not require court interference in the form of a parenting plan. Accordingly, Childs fails to establish that he is similarly situated to parents who are not separated, and his equal protection argument fails. *See J.R.*, 156 Wn. App. at 20.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

MAXA, A.C.J.

MELNICK, J.

17