IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 73466-1-I |
| ALEXA INGRAM-CAUCHI, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) | |
| | ) | |
| STEVEN STOUT, | ) | |
| | ) | |
| Respondent. | ) | FILED: October 31, 2016 |

SCHINDLER, J. — The child relocation act adopts a clear presumption to allow relocation of the parent with whom the child resides a majority of the time. To rebut the presumption, the objecting parent must show the detrimental effect of relocation outweighs the benefit to the child and the relocating parent. The court must consider a number of factors in determining the detrimental effect, but the statutory presumption in favor of relocation is the standard the court must use to resolve competing claims about relocation. Alexa Ingram-Cauchi appeals the trial court order denying her request to relocate to California with the children. The record establishes the court ignored the statutory presumption and contrary to the statute, the court engaged in a best interest of the children analysis. If the court had properly applied the statutory presumption,

relocation should have been granted. We reverse the order restraining relocation, vacate the parenting plan and the award of attorney fees, and remand.

## FACTS

Alex Ingram-Cauchi met Steven Stout in 1989 while attending the University of Washington. Her brother Pete Ingram-Cauchi also attended the University of Washington.

Alexa and her brother grew up in California. Her mother was a teacher. Her father was a teacher and a school principal. Alexa's parents, her brother Pete, and other family members live in Los Gatos, California.

Steve grew up in Washington. His parents and his brother live in Richland and his sister lives in Bellingham.

Steve graduated with a bachelor of science in mechanical engineering. Steve works full time as a design engineer for a company in the Seattle area.

Alexa graduated with a degree in business. Alexa and her mother worked on a curriculum designed to introduce children to technology. In 1999, Alexa and her mother founded a California corporation, iD Tech, as a co-ed summer camp program for children ages 7 to 17. In the first year, iD Tech started with four summer camps at university locations in Northern California. The iD Tech summer camps focused on art media and computer programing related to games and applications. Pete joined the business and developed a business plan for the company. Alexa continued to live in Seattle but traveled to California to work on iD Tech.

In September 2000, Alexa and Steve married. In 2004, G.S. was born. In 2007, W.S. was born. Alexa was the primary caretaker of the children. After the children

2

were born, Alexa worked on the iD Tech business primarily from home. In addition to curriculum and logistics, Alexa assumed responsibilities that allowed her to work from home, including the iD Tech payroll and human resources. Pete assumed responsibility for running the business in California.

After the birth of W.S., Steve started training and participating in triathlons. Alexa expressed concern that Steve was " 'distant' " and did not spend enough time with the family. In 2009, Alexa and Steve engaged in marital counseling.

In 2011, the family lived in the Capitol Hill neighborhood and the children attended nearby schools in the Seattle School District. In August, Steve moved into a nearby apartment. In November, Alexa filed a petition for dissolution of the marriage. Alexa and Steve agreed to entry of a temporary parenting plan. Under the temporary parenting plan, the children would reside with Alexa except for one night during the week and every other weekend.

2012 Parenting Evaluation

In February 2012, the parties agreed to the appointment of Jennifer Wheeler, PhD as the parenting plan evaluator. On September 9, 2012, Dr. Wheeler issued a lengthy report. The report included an account of psychological testing and interviews with the parents, testing and interviews with eight-year-old G.S. and five-year-old W.S., and interviews with family, friends, treatment providers, and others. The purpose of the report was to "assist the court in developing a Permanent Parenting Plan" consistent with the best interests of the children.

Dr. Wheeler stated G.S. and W.S. "are two very sweet, gentle, shy, sensitive, and well-behaved children, who appear to be generally adjusting relatively well to their

3

parents' separation . . . due in large part to the effective parenting of both Alexa Ingram-Cauchi and Steven Stout . . . in the aftermath of their separation." Dr. Wheeler concludes that "[o]verall, it is my opinion that Ms. Ingram-Cauchi and Mr. Stout both appear to be highly skilled, competent, confident, warm, loving, supportive, and effective parents."[1]

The report states Alexa has a "long-standing history of being the 'primary parent' " and assuming greater responsibility for performing parenting functions, and her relationship with G.S. and W.S. is "somewhat stronger and more stable than their relationship with their father." Dr. Wheeler noted Steve had "assumed a more involved and autonomous parenting role post-separation."

Dr. Wheeler expressed "some concerns" about "the children's emotional sensitivity/attunement" to Alexa and her anxiety when the children are with Steve.

> If present, such a dynamic may foster and maintain undue anxiety in the children, as well as potentially threaten their confidence and trust in their father's ability to care for and protect them.

Dr. Wheeler also identified the dynamic created by Alexa's role as the primary parent, Steve's pattern of "learned helplessness," and their different parenting styles as a potential risk to the emotional well-being of the children.

> Importantly, there is an additional risk to the children's emotional well-being, that is posed by the ongoing, maladaptive dynamic between Ms. Ingram-Cauchi and Mr. Stout. Historically, Ms. Ingram-Cauchi has assumed a more "dominant" role in the parenting of the children, including involvement in their school activities, as well as day-to-day decision-making. It appears that as a result, during their marriage, Mr. Stout developed a pattern of "learned helplessness" with regard to the parenting of the children, in which he generally deferred to Ms. Ingram-Cauchi's authority . . . .
>
> . . . .

---

[1] Emphasis in original.

4

Further exacerbating their long-standing problematic parenting dynamic is the fact that, by all reports, Mr. Stout and Ms. Ingram-Cauchi have very different parenting styles: put simply, Mr. Stout regards Ms. Ingram-Cauchi as being "over-protective," and Ms. Ingram-Cauchi regards Mr. Stout as being "under-protective."

Dr. Wheeler concluded it is in the best interests of the children to not "unduly limit their access to either of these two loving, caring, supportive, safe, and nurturing parents." Dr. Wheeler recommended the children eventually reside with their parents on an equal basis but "gradually implemented, over a series of phases," to maintain the children's stability and security by continuing to reside primarily with Alexa.

2012 Agreed Parenting Plan

On December 5, 2012, the court entered the agreed final parenting plan. The parenting plan provides that beginning on January 6, 2013 until the last day of school in 2015, the children would reside with Alexa except Wednesday after school until either Friday or Sunday.[2] Alexa and Steve agreed to "implement a 50/50 residential parenting plan schedule" at the conclusion of the 2015 school year.

> After the last day of school, prior to the summer of 2015, the parents agree that they will implement a 50/50 residential parenting plan schedule. Presently the parents are unsure whether that schedule will be a 5/5/2/2 schedule, a week on and a week off with each parent, or another schedule that meets the needs of the children at that point in time.

---

[2] The parenting plan states, in pertinent part:

SCHOOL SCHEDULE

Upon enrollment in school, the children shall reside with the petitioner/mother, except for the following days and times when the children will reside or be with the respondent/father:

Week 1: Wednesday after school or daycare* until Friday morning return to school or morning care* (*if that parent elects to put the children in daycare).

Week 2: Wednesday after school or daycare* until 5:30 p.m. Sunday evening, return to mother's home.

The above schedule will begin on January 6, 2013 and will continue until the last day of school prior to Summer of 2015.

The parenting plan states the parents agree to engage in "co-parent training to improve their cooperative and communication skills as specified in the additional recommendations section . . . of Dr. Jennifer Wheeler's Evaluation Report." The parenting plan states the intent to raise the children together in Seattle.

> It is the petitioner/mother's intention to stay in Seattle and raise the children here with the respondent/father in spite of the first phase of the residential schedule, when the children will reside the majority of the time with her, prior to the shift to a 50/50 residential schedule in June 2015.

After entry of the final parenting plan, Alexa assumed a number of additional management responsibilities and spent more time at the iD Tech headquarters in California. In early 2013, Alexa and Pete hired a consultant to design a system to manage payroll and benefits.

Following a trial on valuation and distribution of assets, the court entered the decree of dissolution on February 20, 2013. On March 14, Steve sent Alexa an e-mail to let her know he was "currently dating." Alexa responded, "I think this is great for you."

iD Tech grew by approximately 30 percent each year. In 2013, iD Tech was operating summer camps at 80 different campus sites throughout the United States.

In May 2013, Alexa and Pete met with venture capital investors interested in purchasing a percentage of the shares of iD Tech. In August, Alexa and Pete agreed to each sell a 20 percent interest in iD Tech to the outside investors. Alexa and Pete also decided to each contribute 10 percent of the stock they owned to create a stock option pool for iD Tech employees. As a result, the outside investors owned 40 percent of iD Tech, Alexa and Pete each owned 20 percent, and the employees owned 20 percent.

After the investors purchased 40 percent of iD Tech, the company restructured the board of directors (Board). The Board included two members of the investment

group, former Starbucks President Howard Behar, Alexa and Pete, and their friend and business marketing consultant Matthew Baumel. The company developed a number of new programs including iD Tech Mini Camp, a half-day technology program for children ages six to nine; and Tech Rocket, an online program. The company also started focusing on math, science, and engineering.

In October 2013, a senior vice president at Google Inc. and the chief operating officer of Facebook Inc. contacted Alexa and Pete about developing a science, technology, engineering, and mathematics (STEM) summer camp for girls. Alexa and a group of employees worked on designing a new STEM curriculum for a girls-only summer camp, Alexa Café. Alexa worked with a number of technology companies in Silicon Valley to develop the program. Alexa was the President of the Alexa Café program. The Board viewed Alexa as crucial to the implementation and success of Alexa Café.

On January 19, 2014, Steve sent an e-mail to Alexa stating he and Meredith Mallott were engaged. On January 21, Alexa responded:

Steve —

I had some time for the announcement to settle in. I do really want you to know that I am happy for you and Meredith.

I wish you all the luck in the world on your new life!

Let me know when the ceremony is and perhaps I can help the kids go shopping for outfits.

-Alexa.

On April 1, Steve sent Alexa an e-mail telling her that he and Meredith bought a house in Snohomish County. Steve said the completion date for construction of the

house in Brier was in September. Steve asked Alexa, "[P]lease don't mention it to [the children] prior to me talking to them — I want this one to come from me first, I appreciate it." On April 2, Alexa responded:

> Congratulations! It's all you...I won't say anything to the children.
> I am sure they will be happy to have this all squared away and a room to call their own.
> Best, Alexa.[3]

During work on the house in Brier, Steve lived with Meredith, her two teenage daughters, and her seven-year-old daughter in a condominium in Bothell.

In spring 2014, iD Tech launched the Alexa Café summer camp program in Silicon Valley. The Alexa Café summer camp sold out by May. The Alexa Café summer camp program that summer was a success. The Board planned to expand Alexa Café to "ten sites across the country" the following summer.

<u>2014 Notice of Relocation</u>

On July 15, 2014, Alexa filed a "Notice of Intended Relocation of Children." Alexa stated the growth of iD Tech Camps and "opening a new division of the company, Alexa Café," required her to move to Los Gatos, California and asked the court to "allow the children to move with me." The notice states, in pertinent part:

> My brother and business partner [is] Pete Ingram-Cauchi . . . . We work as a team with regard to the overall operation of the business. As our business is expanding, I am having to take on additional responsibilities including risk management and compliance, which have previously been handled by Pete. I am also opening a new division of the company, Alexa Café.
> Our business is technology camps & academies for kids. We instruct over 35,000 students per summer season. We spend the entire school year in business development mode preparing for the summer rollout. Our responsibilities are different in the summer months than during the school year. During the summer, we are not in our offices as

---

[3] Alteration in original.

8

much but in the field visiting university campuses across the country. Until this year, I have been responsible for oversight of 6 campuses in the Pacific Northwest and Pete has been responsible for the other 74 campuses. He cannot keep up this pace, so I am taking on half of the campuses going forward.

For 16 years, I have worked remotely from my home office in Seattle . . . . In the past year it has become necessary for me to travel to California much more often . . . . Even that is not nearly sufficient to fulfill my responsibilities.

. . . .

With the support of several executives at these [Silicon Valley] tech companies, we recently launched our new tech camp for girls' [sic] project: Alexa Café, and I am the President. . . .

I have attempted to fulfill my management duties, including Alexa Café remotely, by traveling to California for a few days every week. However, this has become impossible. Not only do I need to be on site to fulfill my duties at iD Tech, but as the Co-founder of Alexa Café, it has become imperative for me to relocate to California. I simply cannot continue to develop a division of our company from afar. I am asking the court to allow the children to move with me.

I fully understand the impact the move will have on our children. I am willing to pay a reasonable amount for their father to travel to California as well as the children's travel to the Seattle area for visits.

Steve objected to relocation. Steve asked the court to retain the parenting plan schedule entered on December 5, 2012. Steve asserted that "both Alexa and I have our strengths as parents" and not "[h]aving the children's contact with either parent would be detrimental." Steve states that if Alexa "would like to relocate then I would agree to immediately go to a 7 on/7 off schedule so that she could travel during her weeks off." Steve suggests Alexa "travel to California on her off weeks."

Alexa would actually be able to do her work if we went to 50/50 now and she could travel to California on her off weeks. Because I do not have the same flexibility, it would be detrimental for my contact to be curtailed for Alexa's work when she is self-employed and self-directed.

Steve questioned the timing of the notice and the need to relocate.

Given our past agreement that we would both remain in the Seattle area and the fact that Alexa has worked on her business remotely for 15 years, it seems odd that her sudden "need" to move to California arose on the

9

heels of discovering that I was engaged to be married. . . . My job will not allow me to relocate. Alexa is self employed and can absolutely control her ability to continue working in Seattle as she has since 1999.

2015 Parenting Evaluation

Alexa and Steve agreed to appoint Dr. Wheeler as the parenting evaluator. On November 25, 2014, the court entered an order appointing Dr. Wheeler as the parenting evaluator to "always represent the children's best interests" and submit a report on relocation to the court.

On March 3, 2015, Dr. Wheeler issued a 28-page report. Dr. Wheeler states that based on her interviews with the parents, the children, and others, "it is my opinion that the children's relationship with their mother continues to be somewhat stronger and more stable than their relationship with their father." Dr. Wheeler notes the different parenting styles and strengths provide the children "with a well-rounded set of perspectives." Dr. Wheeler states that despite their differences, both Alexa and Steve are "highly interested, involved, skilled, competent, confident, warm, loving, supportive, and effective parents."

> Each of these parents continues to have different parenting styles and respective strengths, which provides the children with a well-rounded set of perspectives and experiences in which to thrive. These differences were described in the previous report, and continue to be present during the current evaluation. Specifically, "...Mr. Stout and Ms. Ingram-Cauchi have very different parting styles: put simply, Mr. Stout regards Ms. Ingram-Cauchi as being 'over-protective,' and Ms. Ingram-Cauchi regards Mr. Stout as being 'under-protective.' " . . .
>
> Despite their differences in personality and parenting styles, both Ms. Ingram-Cauchi and Mr. Stout both appear to be highly interested, involved, skilled, competent, confident, warm, loving, supportive, and effective parents.[4]

---

4 Emphasis in original, italics omitted, first alteration in original.

Nonetheless, Dr. Wheeler repeats concerns she previously raised in the 2012 parenting evaluation about the family dynamics.

> That said - and as described in the previous report - there continue to be dynamics in this family which raise concern regarding the children's long-term emotional well-being. Specifically, I continue to have concerns that the children are too emotionally attuned to their mother's feelings, particularly with regard to her feelings about Mr. Stout's parenting, and this continues to undermine the children's confidence in their father's ability to care for them. . . .
>
> . . . .
>
> This is not to say that Ms. Ingram-Cauchi is deliberately manipulating the children's emotions or perceptions, but rather, that she has a very strong influence on these children's feelings and their perceptions of the world around them (including their father). By all reports, Alexa is an excellent parent who is highly sensitive to her children's emotional needs, to an exceptionally high degree.[5]

Dr. Wheeler states that in her opinion, the "best interests" of the children "will only be served by continuing to have equal access to both of these highly skilled and loving (yet very different) parents" because the decision to relocate "will preclude these children from having this best possible development outcome; that is, enjoying equivalent amounts of time, opportunities, and experiences with each of these loving and highly effective parents."[6] Dr. Wheeler states that "short of persuading" Alexa to continue to adhere to the existing parenting plan, there is "no clear recommendation that will meet the best interests of these children."[7]

> Therefore, short of persuading Ms. Ingram-Cauchi to find a way to proceed with the existing Agreed Parenting Plan (Opinion #1, below), there is no clear recommendation that will meet the best interests of these children.[8]

---

5 Emphasis in original.

6 Emphasis in original.

7 Emphasis in original.

8 Emphasis in original.

Dr. Wheeler presented three options. "Opinion 1:" maintain the 2012 final parenting plan, "Opinion 2A:" relocation to California, and "Opinion 2B:" remain in Washington.

For Opinion 1, maintain the December 2012 parenting plan, Dr. Wheeler recommends a shared week on/week off residential schedule. Dr. Wheeler states it is "unfortunate and disappointing" that Alexa cannot "tailor her new career responsibilities" by continuing the status quo.

> [I]t continues to be the opinion of this examiner that the best interests of the children are served if they resided equally with both parents, as described in their Agreed Parenting Plan entered in December 2012. Specifically, it is my opinion that, the children should reside with each parent on a week on/week off basis, effective in June 2015. As described in the previous report: "...it is a potential risk to the children's long-term emotional well-being to unduly limit their access to either of these two loving, caring, supportive, safe, and nurturing parents. In this family, it is my opinion that the children's best interests are served by providing them with ample access to each of their parents, thus allowing each parent to expose them to their different yet equally valuable parenting styles..." It remains my opinion that the children's best interests are served by a shared, 50/50 residential arrangement.[9]

According to Dr. Wheeler, neither Opinion 2A, relocate the children to California; nor Opinion 2B, require the children to remain in Washington, is in the best interest of the children.

Dr. Wheeler states that if the children relocate to California as stated in Opinion 2A, "some of the children's best interests could be served" because "this arrangement may minimize emotional risks to the children associated with their close bond with their

---

[9] Italics omitted, some alterations in original.

12

mother."[10] But Dr. Wheeler expressed concern about the "negative impact of this arrangement on the children's relationship with their father."

In addressing Opinion 2B, Dr. Wheeler states that "some of the children's interests can be served if they do not relocate with their mother, and reside in Washington," to protect the children from "possible alienation from their father" while also "maintaining their strong bond with their mother."[11]

> In many ways, this option may pose the least risk to the children's long-term emotional well-being, by: (1) protecting their relationship with their father from further alignment with their mother, and possible alienation from their father, if they were to relocate to California; (2) continuing to expose them to the opportunities and experiences associated with their father's parenting style, while also maintaining their strong bond with their mother (which would not be expected to diminish, even if they were physically apart for two weeks at a time).

Dr. Wheeler states that "[a]nother alternative" is to "provide the non-primary residential parent with increased residential time over the course of the year . . . to provide a greater proportion of the summer residential schedule to the parent who is not primary during the school year."

In conclusion, Dr. Wheeler recommended the children "continue to reside equally with both parents, as the parties had previously agreed in the Agreed Parenting Plan entered in December 2012." But if Alexa "is unable to maintain a 50/50 residential schedule due to her work demands," Dr. Wheeler recommended the children "reside in Washington with their father, with up to 50% residential time for mother as her schedule allows."

> Although there would certainly be some short-term adjustments for the children under #2B, it is unlikely that mother's parenting influence would

---

[10] Emphasis in original.
[11] Emphasis in original.

13

significantly diminish under this arrangement, due to Ms. Ingram-Cauchi's strong bond with the children.

. . . .

. . . Each of these parents offers unique strengths to their children, and both of their parenting influences are significant to the children's long-term emotional well-being. Therefore, given the strength of mother's influence, if mother relocates then it is my opinion that the best way to promote this balance is to increase, rather than decrease, father's opportunities to exert his positive parenting influence.

<u>March 2015 Trial</u>

A number of witnesses testified at the trial on relocation including Steve, Dr. Wheeler, psychologist Dr. Bruce Olson, Alexa, her brother Pete, and family members, friends, and coworkers. The court admitted into evidence the 2012 and 2015 parenting evaluation reports prepared by Dr. Wheeler.

Steve testified that if the children are "forced to relocate to California," they will lose out on time with "their father, who is a huge part of their life, . . . and they will benefit from continuing to have . . . what I provide for them as . . . a father." Steve testified that "what's best for my kids" is to not relocate to California with Alexa.

I believe it's in their best interests. They've got their friends here. They've got their schools that they have gone to for a long time. Simply the fact that, you know, I'm very certain that their mother can stay an active part of their lives even though she claims that her business needs her to move down there. So I'm very confident they're going to be best served here and I'm absolutely passionate about that.

Steve testified that even if the "new [Board] is saying 'You have to relocate to California,' " he believed the request to relocate with the children was in "bad faith" because "[t]here's always choices." Steve believed Alexa could continue to live in Seattle and commute to California. "She has worked from the Seattle area for this

company for 16, 17 years since the time that she founded that company with her family."

> I mean, she's been — she was the founder of this company. If there was any sale of this company, she knew what she was getting into. . . . Alexa has always found a way to make things work for what she thinks is — she — she wants to make happen. And so if she wants to move to California, then that's a choice. If — she would have made sure things progress in a way if she — if she intended to stay true to our parent agreement, which — so we signed for the best interests of our kids so we could co-parent here in the Seattle area, she would — she would — we would find a way not to be here right now talking about this.

Steve recognized the difference in their parenting styles but did not believe Alexa interfered with his strong bond with the children.

> I have unconditional love for them. I mean, that comes first and foremost. The kids are lucky that they have that in both parents. . . .
>
>     . . . .
> They know I'm their dad. They know that I'm the — that I'm, you know, their dad at the household, so there's no confusion to them about that they're connected with me very, very closely. We have an extraordinarily strong bond. It might be a longer tether than with their mother's bond, but it's a — it's a strong bond just the same, and the kids are going to benefit greatly from me.

Dr. Wheeler testified both parents were very skilled, loving, and supportive with different strengths and different parenting deficits.

> Both of these parents are very strong parents, very skilled, very loving, very supportive. They're quite different from one another. They each bring different strengths and different deficits, different parenting deficits to the picture, and so it was my opinion that the children would benefit most if they had a balance of each of the influences of each of these strong, supportive parents.

Dr. Wheeler rejected the claim that any "deficits" she addressed in the report "would potentially harm the children." Dr. Wheeler testified the deficits were relatively

small. "[I]n this family anytime we're talking about deficits, we're talking about relative. This is a very skilled, effective family, so we're talking small deficits in the deficit area."

> [A] confusing thing about this family is, again, everything is so relative, that both parents are very loving, very gentle, very warm, very emotionally attuned. It's just Alexa is that much more of all of those qualities relative to Father. But relative to, you know, most fathers, Steve is an exceptionally sensitive father.
>
> . . . .
>
> . . . We're talking about two highly supportive, highly skilled, highly involved parents. One of them does go, you know, way above and beyond what is already excellent, supportive parenting. So when you compare those two already highly supportive parents, yes, one of them does generally come out ahead. And so that's sort of this unusual dynamic in this family is we're — we're not talking about one parent that's negligent and incapable. We're talking about two very attentive and very capable parents.

Dr. Wheeler testified that the dynamic of alignment or affinity of Alexa with the children was not uncommon.

> [I]t's not uncommon, and not just in divorced families, in all families. It's not at all uncommon for children to have particular alignments or affinities with either parent at different points in the course of their development. In early years, it's often Mother. In later years, it can be Father. It can vary by gender, it can vary by age, it can vary b[y] personalities and temperaments.
>
> I think there is quite a bit of that going on in this family. The children have personalities and temperaments that are much similar to Alexa's in terms of their anxiety and perfectionism, so I think that there is some of that in their emotional attunement.

In response to whether Dr. Wheeler considered "the mother's circumstances in this potential move," Dr. Wheeler testified she accepted Alexa's position that she needed to relocate but "it just seems like there could have been another way for everyone's needs to have been met without the children having to take a risk of losing their relationship with their father."

Dr. Wheeler testified it was in the "best interests" of the children to have equal access to both parents.

> [M]y opinion in terms of what's in the best interests of the children is that whatever arrangements can be made, however it looks like, if at the end of the day these children have equal quality access to both parents. That's in their best interests. So sticking with the plan they have would be one version of that. I recognize that that's not an option given the relocation, but that is my opinion about what's in their best interests.

Dr. Wheeler testified the children should remain in Washington because Alexa had more flexibility and her bond with the children would not be diminished.

> [T]he reason why I think the kids would be more likely to have more success if they stayed in Washington is that although I recognize her flexibility is not as flexible as it once was, because she's the owner of her company and the president of her company and she has been doing it for so long, there is a precedent set for Mother to do more traveling away from work versus that's not a precedent that's set for Father and his job. So I feel like there's more opportunity for Mother to maximize more of that residential schedule relative to Father if the children resided in Washington.

Psychologist Dr. Bruce Olson testified that an "alignment" between a child and a parent is a "naturally occurring phenomenon." Dr. Olson testified that Alexa's "attunement" to the children as described in Dr. Wheeler's report is not a problem. "I would not see that as a problem. I think in a parenting situation, that's a good thing." Because there are "a lot of variables that occur in a parent's life and a child's life, a lot of changes that occur," it is "normal" for a child to "flow from attunement to alignment to affinity over the course of time between both parents." Dr. Olson said there is "no predictive likelihood" that alignment or attunement with one parent leads to parental

alienation of the other parent. According to Dr. Olson, "alienation of one parent from the children . . . isn't a natural sequence that inevitably has to occur."

> [T]hese are very subjective — very subjective things. And I don't think as psychologists we have much ability to predict those things. And I think the literature would suggest that we don't — we don't have the ability to predict those things.

Alexa testified that iD Tech has grown from "basically three core employees and some summertime instructors" to currently 150 full-time employees and approximately 1,600 part-time employees and an expectation that 45,000 students would attend iD Tech summer camps in 2015.

Alexa described the changes and demands of the company since entry of the 2012 parenting plan. Alexa testified that the success and expansion of iD Tech and Alexa Café requires her to relocate to California. Alexa explained why she could not work on an "every-other-week basis" and her unsuccessful attempts to do so.

> I've tried telecommuting as far as Skyping, Google Hangouts. I've flown down there this fall for three weeks, sometimes four weeks out of the month. On the days that I don't have the children, I've tried so many different things. And it's very frustrating to my employees. It's very frustrating. I mean, I can't imagine — I've managed this long to put a Band-Aid on something and it's just getting to that point where something's got to give and I have to make a decision.

In response to a question posed by the court, Alexa testified that if the children could not relocate with her to California, it would be very difficult for the children to live with her in the summer. "[T]hat's the three months that we have for our program. So that would be immensely difficult."

Pete testified that Alexa cannot "continue in her role at iD Tech if she's not living full-time in California." Pete described the changes in the business after the outside

investors purchased shares in the company in 2013.

> [W]e brought on a board of directors to help steer — steer us forward. We've — as I mentioned before, we had to go — do much more — much bigger investment in leadership development and training. We're rolling out, you know, a whole host of new products all based on STEM — science, technology, engineering, and math. But rolling out those formats all over the country and all over the world, those are all very significant changes. . . . [T]he rules have changed and we're moving much faster and decision making has to be — it has to be faster and crisper and we all have to be on the same page all the time.

The court asked Pete whether Alexa could continue to live in Seattle and spend half of every week in California.

> So my focus, of course, is on kids. And there's legal factors I have to look at. Bottom line is my decision will be whether the kids move or stay . . . and [Alexa] decides to be there a half a week every week.

Pete told the court the suggestion that Alexa work part time in California was not a viable option. "[W]e've tried . . . . It's not as effective. . . . It's just simply not. So it — it hurts us." Pete testified Alexa could not meet her management responsibilities unless she was working at iD Tech full time in California. Pete testified that from the Board's perspective, the move to California was "nonnegotiable."

Board member and business marketing consultant Matthew Baumel testified that the Board expects Alexa "to be there and to be a leader" and be "the face of Alexa Café." Baumel said it was "extremely important" to have Alexa in the California office every day and was "really nonnegotiable."

Alexa asked the court to allow Board member Howard Behar to testify for the "very limited purpose" of addressing the expectations of the Board and the need to relocate to California.

> [Behar] will testify, as an offer of proof, that he believes that it's necessary for Ms. Ingram-Cauchi to be in California. He would say that he's joined

19

the board because he's excited about the girls' STEM initiative. It's important and critical that Ms. Ingram-Cauchi be in the office on a daily basis to manage the rollout and to provide day-to-day leadership for the girls' STEM technology initiative. He would testify that the board of directors for iD Tech has an expectation for the entire executive team to be on location at headquarters in California. He would testify that, given the size and growth of the company, the executive management supervision must be hands-on, requiring the cofounder and president to be on the ground in California at the headquarters on a daily basis.

. . . .

. . . And he would say that it's critical to the success and future growth of the company and current success of the company for the cofounder and president to be in California on a day-to-day basis. And he will testify the decisions which affect the entire company must be made on a timely basis requiring the cofounder, president to be at the California headquarters and that it's not possible to manage and oversee a company of this size by telephone or Skype or some type of technological intervention.

The court denied the request to allow Behar to testify.

Steve testified in rebuttal. In response to a question from the court about the residential schedule if the children were "allowed . . . to go to California," Steve said he would want "[b]asically all summer" and all vacations and three-day weekends during the school year.

In closing argument, Alexa agreed the children could reside with Steve the entire summer.

[Alexa] heard Mr. Stout's testimony and she took that to heart and she is now proposing, she's changed her proposed parenting plan to say that if he doesn't want to come down during the winter for several weeks during the winter, then why doesn't he just have the entire summer?

On April 20, 2015, the court entered an order and extensive findings of fact on the objection to relocation. The order does not permit Alexa to relocate with the children to California.

On May 7, the court entered a final parenting plan. The parenting plan allows the children to "reside as close to 50/50 with both parents" as recommended by Dr. Wheeler. The parenting plan states the court would have "preferred to impose a week on/week off" schedule that would have "allowed the children to remain in the school in which they are currently enrolled. No doubt, this would have been the optimal plan and in the best interest of the children," but Alexa said she "could not accommodate that plan due to her work schedule."

> Pursuant to the 12/5/2012 Parenting Plan and recommendations of Dr. Wheeler's 3/3/2015 evaluation report, the children shall reside as close to 50/50 with both parents. This Court would have preferred to impose a week on/week off parenting plan switching on Wednesdays as discussed during the trial. This plan would have allowed the mother to have three consistent days in the office every week and see her children every week. This plan would have also allowed the children to remain in the school in which they are currently enrolled. No doubt, this would have been the optimal plan and in the best interest of the children. However, mother stated that she could not accommodate that plan due to her work schedule. Although the court still believes that plan is feasible and is disappointed that the mother chose not to try this alternative, the court must take the mother at her word that her work needs are too pressing to accommodate such a schedule.

The court notes that if Alexa decides she "can accommodate" the "50/50 plan switching on Wednesdays for her children's benefit," the court will retain jurisdiction for one year "for the sole purpose of implementing a 50/50 parenting plan switching on Wednesdays without the need for an adequate cause finding."

Alexa appeals the order restraining relocation, the parenting plan, and the award of attorney fees to Steve.

ANALYSIS

Alexa contends the court erred by ignoring the statutory presumption allowing her to relocate with the children to California and adopting the best interest analysis of Dr. Wheeler.

The Washington State legislature enacted the child relocation act (Relocation Act) in 2000. LAWS OF 2000, ch. 21; RCW 26.09.405-.560. The Relocation Act establishes a clear presumption in favor of allowing the parent "with whom the child resides a majority of the time" to relocate. RCW 26.09.430, .520. RCW 26.09.520 states, "The person proposing to relocate with the child shall provide his or her reasons for the intended relocation. There is a rebuttable presumption that the intended relocation of the child will be permitted."

The presumption in favor of allowing relocation both incorporates and gives substantial weight to the traditional presumption that in making the decision to relocate, a fit parent is acting in the best interest of the children. In re Marriage of Horner, 151 Wn.2d 884, 895, 93 P.3d 124 (2004) (citing In re Custody of Osborne, 119 Wn. App. 133, 144, 79 P.3d 465 (2003)). In Horner, the Washington Supreme Court emphasized that the presumption in favor of the "interests and circumstances of the relocating parent" is "[p]articularly important." Horner, 151 Wn.2d at 894.

Under the Relocation Act, the burden of persuasion and the burden of production is on the parent opposing relocation. In re Marriage of McNaught, 189 Wn. App. 545, 556, 359 P.3d 811 (2015). To rebut the presumption, the parent entitled to residential

22

time must demonstrate that "the detrimental effect of the relocation outweighs the

benefit of the change to the child and the relocating person." RCW 26.09.520.

> [The Relocation Act] requires proof that the decision of a presumptively fit parent to relocate the child, thereby interfering with residential time of a parent or visitation time with a third party that a court has previously determined to serve the best interests of the child, will in fact be harmful to the child—and in fact, so harmful as to outweigh the presumed benefits of relocation to the child and relocating parent.

Osborne, 119 Wn. App. at 146-47.

The statute identifies 11 factors the court must consider. RCW 26.09.520(1)-

(11). The 11 factors are:

> (1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;
> (2) Prior agreements of the parties;
> (3) Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;
> (4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;
> (5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;
> (6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;
> (7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;
> (8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;
> (9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;
> (10) The financial impact and logistics of the relocation or its prevention; and

> (11) For a temporary order, the amount of time before a final decision can be made at trial.

RCW 26.09.520.

The factors are "not weighted" or listed in any particular order. RCW 26.09.520; Horner, 151 Wn.2d at 894. The factors "serve as a balancing test between many important and competing interests and circumstances involved in relocation matters." Horner, 151 Wn.2d at 894.[12] But the presumption "provides the standard the trial court uses at the conclusion of trial to resolve competing claims about relocation." McNaught, 189 Wn. App. at 556.

We review the trial court decision to deny relocation for abuse of discretion. Horner, 151 Wn.2d at 893. A decision is manifestly unreasonable if it is outside the range of acceptable choices given the facts and the applicable legal standard. Horner, 151 Wn.2d at 894. A decision is based on untenable grounds if the factual findings are unsupported by the record. Horner, 151 Wn.2d at 894. A decision is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard. Horner, 151 Wn.2d at 894.

Alexa argues the record shows the trial court correctly states but ignores the statutory presumption that allows her to relocate with the children to California. Alexa asserts the court also erred in engaging in an analysis that focuses on only the best interests of the children and the relationship with Steve. Steve concedes the decision

---

[12] The court in Horner notes that many of the child relocation factors refer to the interests and/or circumstances of the relocating parent, including factor 2, prior agreements of the parties; factor 5, the reasons each parent is seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation; factor 7, the quality of life, resources, and opportunities available to the children and to the relocating parent in the current and proposed geographic locations; and factor 10, the financial impact and logistics of the relocation or its prevention. Horner, 151 Wn.2d at 895 n.10; RCW 26.09.520(2), (5), (7), (10).

24

"is lockstep with" Dr. Wheeler but asserts the court did not abuse its discretion in applying the presumption and considering the statutory factors. We disagree.

While the trial court correctly states Alexa is "entitled to the rebuttable presumption that the intended relocation of the children will be permitted," the findings show the court did not apply the presumption in evaluating the statutory factors or resolving the competing claims about relocation.

The record also shows the court improperly focused on only the best interests of the children. The Relocation Act "shifts the analysis away from only the best interests of the child to an analysis that focuses on both the child and the relocating person." Horner, 151 Wn.2d at 887;[13] RCW 26.09.520. Here, as in Horner, the trial court's repeated reference to only the best interests of the children is contrary to the standard for a relocation decision. Horner, 151 Wn.2d at 894.

The court relied heavily on the parenting evaluations and the testimony of Dr. Wheeler in analyzing the statutory factors under RCW 26.09.520 and deciding whether to allow relocation. The court finds the 2012 parenting evaluation and the 2015 parenting evaluation "thoroughly completed" and the testimony of Dr. Wheeler "credible and quite thoughtful." Throughout the findings and consideration of the 11 statutory factors, the court repeatedly cites Dr. Wheeler and the best interest of the children to conclude 7 factors weighed against relocation, 1 factor was neutral, and 1 factor weighed in favor of relocation.[14]

---

[13] Emphasis added.

[14] Two of the statutory factors, factor 4 and factor 11, did not apply. Factor 4 addresses residential limitations under RCW 26.09.191. RCW 26.09.520(4). Factor 11 relates to a temporary order. RCW 26.09.520(11).

In concluding factor one, "[t]he relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life"[15] does "not weigh in favor or against relocation," the court ignores the presumption and adopts Dr. Wheeler's conclusion that "consistent contact with both parties is necessary <u>for the best interest of the children</u>."[16]

> Both parents have very strong relationships with the children. The overwhelming consensus by the witnesses is that the children are highly bonded with both parents. While each parent has a different parenting style, each parent is highly involved and thus consistent contact with both parties is necessary for the best interest of the children.

The findings also state the children "have lived in Seattle their entire lives" and both "are quite social," they have good friends in school, and they are involved in soccer and ballet, "participating in and getting leading roles in the Nutcracker."

The court acknowledges Alexa has a "stronger and more stable" relationship with the children but relies on Dr. Wheeler's opinion that "this is, in part, due to the narrative that mother is a 'better' parent that has been internalized by the children."

In addressing factor two, the "[p]rior agreements of the parties,"[17] the court concludes this factor "weighs against the children being relocated to California." The court cites the parties' agreement "to raise the children in Seattle and that during the dissolution, the mother said she would not move the children far away from the father." The court does not take into consideration the presumption that allows Alexa to move with the children, the need to relocate to California, or that Steve had moved to Snohomish County.

---

[15] RCW 26.09.520(1).
[16] Emphasis added.
[17] RCW 26.09.520(2).

In considering factor three, "[w]hether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation,"[18] the court adopts the concerns of Dr. Wheeler as expressed in the report related to "family dynamics" and " 'the potential negative impact on the children of losing day-to-day contact with the father.' "

> In the September 2012 report, Dr. Wheeler noted, "[I]n this family, it is my opinion that the children's best interests are served by providing them with ample access to each of their parents . . . .["]

> In the recent report, Dr. Wheeler described continual concerning family dynamics that could have long term effect on the children's emotional well-being: the children are excessively attuned to their mother's feelings, particularly with respect to her perception of the father's parenting, and this continues to undermine the children's confidence in the father's ability to care for them; they have become highly aware of the differences between their parent's households and in their minds, the mother's way is "right" and father's way is "wrong." . . . Dr. Wheeler further explained that mother's actions are not necessarily intentional but that she has a "blindspot" about the ways in which she devalues the father's parenting role and the effect it has on her children. . . . Although the Court doubts that mother is undermining father deliberately, this pattern is highly concerning to the Court. In addition, Dr. Wheeler indicates concerns regarding the children's "burgeoning perfectionism and associated rigid (black or white) thinking." Dr. Wheeler expressed concerns that the children would develop unduly concrete notions of good/bad instead of more adaptive flexible thinking skills and the ability to view a situation from multiple perspectives. . . .

> . . . Dr. Wheeler opined: "[T]he primary concern for the children relocating to California is the potential negative impact on the children of losing day-to-day contact with the father, particularly given the problematic dynamics of this family, which are already marginalizing the father's parenting role. If the dynamic is not effectively intervened upon, such alignment could make these children increasingly vulnerable to becoming "alienated" from their father.[19]

---

[18] RCW 26.09.520(3).

[19] Some alterations in original.

The court agreed with Dr. Wheeler that disrupting contact with the mother would be less detrimental.

> Conversely, Dr. Wheeler does not find that there would be any danger of any long-term negative impact on the mother's relationship with her children if they stayed in Washington. She testified although the children would experience some initial sadness, given the strength of their bond and assurance that there would be regular and consistent visits/communication, the mother-child relationship would stay intact.

The court's conclusion that "[t]his factor weighs strongly against relocating the children to California" ignores the presumption and is based on speculative concerns. Dr. Wheeler testified that the concerns addressed in her report were relative and "small." The children's pediatrician described the family dynamics as different parenting styles that are " 'very common' " with " 'no red flags.' " Dr. Wheeler's 2015 report states:

> Regarding the dynamic where mother regards father as "under-attentive," and father regards mother as "over-attentive," [the children's pediatrician] said, "That is how they see each other... mom might be overly-concerned, but she listens and doesn't push me.... their complaints of each other are very common in parental values... there are no red flags for me."[20]

There is no dispute that Alexa has been the primary caregiver, that she has a stronger bond with the children, and that there is no evidence of alienation.

The court found statutory factors 5, 6, 8, 9, and 10 weighed against relocation. Again, the record shows the court ignores the statutory presumption and uses a best interest analysis.

In considering factor five, "[t]he reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation,"[21] the court finds Alexa's reasons for moving to California were in good faith.

---

[20] Some alterations in original.

[21] RCW 26.09.520(5).

28

However, the court finds indications of "bad faith." Specifically, the court criticizes Alexa because she did not try a 50/50 residential schedule arrangement and notes the request for relocation was filed before implementation of a 50/50 residential schedule the next year.

The court finds Alexa "has lived in Seattle with her family for the last 17 years, and has been able to successfully balance her business and family demands." The court acknowledges there is "[n]o doubt" that "Board members or other members of the company have placed pressure on the mother to move to California." Contrary to the undisputed evidence, the court finds "no evidence . . . of any Board mandate that mother move to California or negative consequence to her position if she remained in Seattle." The unrebutted testimony established significant "negative consequences" and that moving to California was "nonnegotiable." Pete testified Alexa could not meet her responsibility to manage human resources, payroll, risk management, or Alexa Café by working remotely. Pete testified that from the Board's perspective, it was "nonnegotiable" that Alexa move to California. Baumel testified it was "really nonnegotiable" that Alexa move to California.

We also note the court also erred in excluding the testimony of Board member Howard Behar. The court did not properly consider the Burnet factors before excluding his testimony. Keck v. Collins, 184 Wn.2d 358, 369, 357 P.3d 1080 (2015) (citing Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997)). Before excluding witness testimony,

> the trial court must explicitly consider whether a lesser sanction would probably suffice, whether the violation at issue was willful or deliberate,

29

and whether the violation substantially prejudiced the opponent's ability to prepare for trial.

Jones v. City of Seattle, 179 Wn.2d 322, 338, 314 P.3d 380 (2013) (citing Burnet, 131 Wn.2d at 494).

The court denied Alexa's request to call Behar to testify about the Board mandate that Alexa move to California. The record establishes the court did not consider whether the failure to timely disclose the testimony of Behar was willful. Jones, 179 Wn.2d at 345.[22]

In considering factor six, "[t]he age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child,"[23] the court notes Dr. Wheeler's finding that " 'both parents appear skilled at supporting both of the children's cognitive, social and emotional development.' " Nonetheless, the court weighs this factor against relocation in order to protect the relationship with the father.

Quoting from Dr. Wheeler's report, the court finds it should " 'intervene[ ]' " in the " 'dynamic' " that Alexa "has engaged in behavior (consciously or unconsciously) that has had a negative emotional impact on the children," making the children " 'appear to be anxiously monitoring [Steve's] behaviors and home environment.' " But the opinion the court relies on is speculative. Again, as Dr. Wheeler made clear, the parental deficits she identified in her report were relative and minor.

---

[22] The court ruled, in pertinent part:

> I think that since he was never disclosed and there is clearly substantial prejudice being that we're in the middle of trial, I don't think a lesser sanction of having him be deposed and testifying tomorrow is adequate. I think that would be — you know, it's really a little bit trial by ambush. So I'm not going to allow his testimony.

[23] RCW 26.09.520(6).

Further, without regard to the statutory presumption, the court concludes that because Steve recently moved to Brier, it "seems unnecessary to add a move to California when these children have just adjusted to their new situation."

Factor eight considers "[t]he availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent."[24] Factor nine considers "[t]he alternatives to relocation and whether it is feasible and desirable for the other party to relocate also."[25]

The court finds factor eight and factor nine weigh against relocation because Alexa "has an alternate arrangement to foster a balanced relationship with the children without impacting the father's relationship with the children: she can reside in California with a midweek week on/week off basis . . . so that there are consistent three days a week in the office." The court finds "this would have been a reasonable alternative to at least try." The court finds Alexa had not "tried this as an alternative" and "[t]his very well may be a solution to the heightened demands at work." The court finds Steve "cannot relocate" because he is employed in Washington, "recently built a home in the area," and "has a fiancé who has a shared custody arrangement for her three children" in Washington.

The court findings not only ignore the statutory presumption that allows relocation and the undisputed testimony that Alexa tried commuting to California and a week-on/week-off schedule was not feasible, but also violate RCW 26.09.530. RCW 26.09.530 states:

> In determining whether to permit or restrain the relocation of the child, the court may not admit evidence on the issue of whether the person seeking

---

[24] RCW 26.09.520(8).
[25] RCW 26.09.520(9).

31

to relocate the child will forego his or her own relocation if the child's relocation is not permitted or whether the person opposing relocation will also relocate if the child's relocation is permitted. The court may admit and consider such evidence after it makes the decision to allow or restrain relocation of the child and other parenting, custody, or visitation issues remain before the court, such as what, if any, modifications to the parenting plan are appropriate and who the child will reside with the majority of the time if the court has denied relocation of the child and the person is relocating without the child.

In considering factor 10, "[t]he financial impact and logistics of the relocation or its prevention,"[26] the court finds Alexa has a "high net worth that allows her much flexibility" to "fly freely between Seattle and California with little impact on her finances." The court finds Alexa has the "flexibility in the hours she works so [she] can create long weekends or be at significant scheduled children's activities during the week." The court finds Steve "has less flexibility in his job" and limited paid time off.

Finally, while the court concludes factor seven, "[t]he quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations"[27] weighs in favor of relocation, the court does not apply the statutory presumption. Instead, the court finds, "Clearly, it would be easier for the mother if she relocated to California with her children."

In sum, because the trial court did not apply the statutory presumption that allows relocation, improperly used a best interest analysis, and ignored the evidence, we conclude the court abused its discretion in denying the request to relocate and entering the order that prevents the children from relocating to California with Alexa. If the court had properly applied the statutory presumption, the request to relocate should have been granted.

---

[26] RCW 26.09.520(10).
[27] RCW 26.09.520(7).

Alexa also argues the court erred in awarding fees to Steve without making a finding of financial need. We agree. Under RCW 26.09.140, a trial court has the discretion to award reasonable attorney fees in a child relocation matter. But the decision to award attorney fees under RCW 26.09.140 must be "based upon a consideration that balances the needs of the spouse seeking fees against the ability of the other spouse to pay." In re Marriage of Moody, 137 Wn.2d 979, 994, 976 P.2d 1240 (1999). Here, neither party filed a financial declaration. The court found there is "no question that mother has the financial ability to pay" but had no basis to address the financial need of Steve.

We reverse the order denying relocation, vacate the parenting plan, vacate the award of attorney fees, and remand.

WE CONCUR:

33