# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of<br><br>GARTH RICH,<br><br>          Respondent,<br><br>     and<br><br>JESSICA RICH,<br><br>          Appellant. | No. 83365-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — Following dissolution of Garth and Jessica Rich's marriage, Garth petitioned to relocate the children to Arizona.[1] The trial court granted Garth's petition. Jessica appeals and challenges the trial court's consideration of the statutory relocation factors and the sufficiency of the evidence to support the trial court's decision. Both parties request attorney fees on appeal.

We reverse the trial court's order granting the relocation and remand for further proceedings. We convert the existing parenting plan, child support order, and relocation order, to temporary orders until the trial court enters new temporary or final orders. We decline to award attorney fees to either party.

_____

[1] We refer to the parties by their first names for clarity. We mean no disrespect.

I.

A.

Garth and Jessica married in Washington in 2007. They have three children, R.R., P.R., and L.R. Since 2017, P.R. has lived full time at a care facility in Idaho.[2] At the time of the relocation trial, R.R. was 11 years old and L.R. was 4 years old. The family lived in Virginia from 2011 to 2014 and Texas from 2014 to 2015. Garth traveled for months at a time while Jessica stayed home with the children. They moved back to Washington in 2015. Garth obtained a job with Boeing. Jessica returned to work when L.R. was one and has worked at Microsoft ever since. Garth and Jessica dissolved their marriage in 2019.

A guardian ad litem (GAL) was appointed during the dissolution. The GAL reported that R.R. was closely bonded with Jessica and having some difficulty with transitions. Ultimately, the GAL found that both parents are closely bonded to the children finding, "[t]he parents bring different strengths and styles to parenting. Jessica seems to have close emotional bond with the girls and Garth brings routine and stability." The GAL recommended a 50-50 shared parenting plan.

Under the final parenting plan, Garth was designated as the person with whom the children reside a majority of the time; the parties had joint decision-making authority. The children would spend 4 of every 14 nights with Jessica.

---

[2] Because of this, P.R. was not included in the relocation and further references to P.R. will be limited.

B.

In March 2021, Garth notified Jessica of his intent to relocate to Arizona with R.R. and L.R. In the notice, Garth explained his reason for moving as "solely a career development opportunity." Jessica objected to the relocation.

Jessica moved for a temporary order to prevent the move. During the hearing, Garth argued that the relocation was "mandatory for [Garth] to maintain his employment with Boeing." Garth argued that because Boeing had funded his master's degree, in the amount of $45,000, Garth would "be on the hook for [it] if he refuses to relocate." On the good faith factor,[3] the trial court found:

> I don't have any substantial information other than that the father has testified under oath that he is moving for his job, the job is relocating, and he has to follow it. I'm well aware that the mother doesn't agree with his assertion there, and I suspect there is discovery being done on that, and there may be more information at trial. But I don't have any other information that is reliable at this point, and so all I know is that father is alleging that he's moving there, has testified under oath that he's moving there for a job, and that is in good faith.

Finding that Garth was likely to prevail at trial, the trial court granted Garth temporary permission to move with the children. Under the temporary parenting plan, the children relocated to Arizona after the mother's summer time with them ended on July 24, 2021.

C.

The trial court held trial over several days beginning on August 17, 2021. Garth presented testimony from several lay witnesses, including his father, brothers, and friends, and neighbors. Many of these witnesses had never seen Jessica with the children or had spent minimal time with Jessica while the parties were married. Jessica

---

[3] RCW 26.09.520(5).

presented testimony from her mother, sisters, and experts involved with R.R. While both L.R. and R.R. were the subject of the relocation, much of the testimony focused on R.R. and how the relocation would affect her.

The children's pediatrician, Dr. Annie Pineyro, testified. Dr. Pineyro had been the primary care provider for R.R. and L.R. since July 2019. While L.R. has only been seen for a few visits, she is developmentally appropriate for her age and generally healthy. In late June 2021, Dr. Pineyro started seeing R.R. for vomiting multiple times a day that seemed affiliated with anxiety. R.R. had a history of sensory processing disorder and anxiety. Because of persistent vomiting and resulting dehydration, R.R. was admitted to Seattle Children's Hospital on July 19. R.R. had lost 13 pounds in 3 months, dropping from the 50th percentile to the 15th. The hospital admission was to try to get R.R. "under control" before her flight to Arizona.

When Dr. Pineyro saw R.R. for vomiting, she recommended that Jessica obtain an evaluation and testing to have a better understanding of R.R. The evaluation of R.R. led to a diagnosis of autism spectrum disorder, specific learning disorder impairment in math, and separation anxiety disorder. After reviewing the evaluation, Dr. Pineyro testified that a child like R.R. would have more difficulty with transitions. She also testified that there are "so many layers to [R.R.'s] care." As for the parents, Dr. Pineyro said she was not concerned with R.R. being in either of their care, and she never saw inappropriate interactions between either parent and R.R. She added, "I do think they are involved. I've had a lot of communication with both of them. But I do think that [R.R.] is extremely sick right now, and whether that is physiological or mental, or both, she needs consistent care."

Dr. Pineyro recommended that R.R. remain in counseling, consult a psychiatrist for a medication management program if the vomiting was not under control, or obtain a GI workup to stop her from losing weight. Dr. Pineyro also recommended R.R. attend some sort of group therapy or occupational therapy for the autism spectrum diagnosis, and obtain an IEP for accommodations at school.

R.R.'s licensed mental health counselor, Dr. Cecile Culp Mielenz also testified. Dr. Mielenz had 48 sessions with R.R. between August 2020 and trial. In 2020, Jessica contacted Dr. Mielenz for assistance with the anxiety R.R. was experiencing when transitioning between the parties' homes. R.R. had seen another therapist for several years. Dr. Mielenz was aware of R.R.'s history of separation anxiety and vomiting when upset.

Dr. Mielenz described R.R.'s anxiety as follows:

> [R.R.'s] anxiety is notable, but I find that she can talk about it, and she's very receptive to strategies to lessen her anxiety. She's also helped by having a plan for how to approach issues that she finds difficult or that she worries about. Talking with her about reframing the way that she views a situation has also been very helpful.

Dr. Mielenz explained that R.R. struggled with the transition to remote learning, then back to in-person, but opined, "those are so minor compared to a move to another state, a move away from her school, a move away from her friend, a different climate, a different culture, geographical region."

Dr. Mielenz testified that when R.R. learned of the potential move to Arizona she "regressed a lot" and "was really overwhelmed and distraught about the whole thing . . . [i]t was hard for her." R.R.'s vomiting "has reemerged as an indication of her emotional distress." In their last appointment together, two days before the move to Arizona, R.R.

expressed sadness that Garth might be extra mean, that he doesn't care about her, and he won't listen to her.

Dr. Mielenz concluded that R.R. has "shown us that a move to Arizona is not good for her emotionally, socially, physically." Her opinion was based on the dramatic increase in R.R.'s vomiting, weight loss, and worries and fears that R.R. expressed in her last session with Dr. Mielenz.

Dr. Mielenz explained that R.R. is connected to Jessica as her primary attachment figure and R.R. tends to be more vulnerable with Jessica. She was impressed by the way Jessica handled R.R.'s concerns about the move and reluctance to speak with her father. Jessica "would try to reframe things for [R.R.], to have her look at the situation with her dad in a different way, in a more positive way." "[I]t's clear she loves her daughter. She doesn't want her to have a bad experience. She's trying to help her get through this the best she can."

Dr. Kristine Berrett, who evaluated R.R., also testified. Dr. Berrett agreed to do an expedited evaluation of R.R. at the request of Dr. Mielenz because of R.R.'s upcoming move to Arizona. Both parents completed questionnaires on R.R. that reflected similar perspectives on R.R. Dr. Berrett diagnosed R.R. with autism spectrum disorder, specific learning disorder impairment in math, and separation anxiety disorder.

At trial, Dr. Berrett explained that a child on the autism spectrum would experience challenges with parents living significantly far apart on many levels. She opined, "[a]ny type of transition is difficult . . . there needs to be a plan in place."

Even lay witnesses who spent limited time with R.R., recognized that she has challenges. Witnesses described R.R. as having "some sort of social anxiety . . .

interacting with people was difficult for her." R.R. "has some challenges" and is "not very comfortable meeting people." Garth's brother, Timothy, testified that he visited Garth and the children in Arizona just before the relocation trial. He described R.R. as "anxious at times" and he testified that when he heard about the relocation he thought it might be challenging for the children "especially [R.R.] to be honest."

R.R.'s former principal, Molly Lutz testified. Lutz testified that R.R. had made huge growth in her time at Eagle Rock Multi-Age school. Lutz also explained that the school has transition services for students that have interventions in place, like R.R., for moving into middle school. The district works closely with the counseling team and teachers to make sure the interventions that were successful continue into the next grade. R.R.'s school counselor had also planned to meet with R.R. weekly to help her with the transition to middle school.

As for the parents, Lutz explained that after Jessica had a conflict with a teacher when school was operating remotely, Lutz determined it would be best for her to be present during meetings going forward. But Lutz testified that she never felt Jessica was inappropriate with school staff or overstepped boundaries in advocating for R.R. Lutz also oversees special education and had worked with P.R. before she moved to Idaho. Both parents were appropriate in their interactions with the school about P.R. Lutz had no concerns about either parent and had not received complaints about either of them.

After trial, the trial court granted Garth's relocation and entered a new final parenting plan. The trial court's written findings, entered after a presentation hearing, incorporated the trial court's oral ruling.

Jessica appeals.

## II.

## A.

The child relocation act (CRA), RCW 26.09.405, governs the process for relocating the primary residence of a child who is the subject of a court order for residential time. In re Marriage of McNaught, 189 Wn. App. 545, 553, 359 P.3d 811 (2015). If the relocating parent enjoys a majority of the child's residential time, the CRA creates "a rebuttable presumption that the intended relocation of the child will be permitted." RCW 26.09.520; McNaught, 189 Wn. App. at 553. A parent opposing relocation "may rebut the presumption by demonstrating" by a preponderance of the evidence "that the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person." RCW 26.09.520; McNaught, 189 Wn. App. at 553.

Under RCW 26.09.520, the trial court considers several factors to determine whether the harm of a proposed relocation outweighs its benefits:

> (1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;
>
> (2) Prior agreements of the parties;
>
> (3) Whether disrupting the contact between the child and the person seeking relocation would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;
>
> (4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;

(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;

(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;

(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;

(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;

(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;

(10) The financial impact and logistics of the relocation or its prevention; and

(11) For a temporary order, the amount of time before a final decision can be made at trial.

These factors are not weighted or listed in any particular order. RCW 26.09.520; In re Marriage of Horner, 151 Wn.2d 884, 887, 93 P.3d 124 (2004).

We review a trial court's decision to grant or deny a petition for relocation for abuse of discretion. See Horner, 151 Wn.2d at 893. A trial court abuses its discretion if its decision is unreasonable or based on "'untenable grounds or reasons.'" Horner, 151 Wn.2d at 893 (quoting State v. Brown, 132 Wn.2d 529, 572, 940 P.2d 546 (1997)). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; [and] it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the

requirements of the correct standard." Horner, 151 Wn.2d at 894 (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)).

We do not reweigh the evidence to determine whether we would reach a different conclusion from the trial court. McNaught, 189 Wn. App. at 561. Rather, we determine whether a trial court's findings of fact are supported by substantial evidence: evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the matter asserted. In re Marriage of Chandola, 180 Wn.2d 632, 649, 327 P.3d 644 (2014). To that end, we are not bound by the trial court's findings if the trial court "rejects uncontroverted credible evidence, or capriciously disbelieves uncontradicted evidence." Smith v. Pac. Pools, Inc., 12 Wn. App. 578, 582, 530 P.2d 658 (1975).

A trial court may abuse its discretion if it considers facts irrelevant to a particular factor or fails to consider relevant facts necessary for applying a factor. See Shrauner v. Olsen, 16 Wn. App. 2d 384, 412-13, 483 P.3d 815 (2020).

Here, the trial court found that Jessica failed to rebut the presumption that the benefits of the relocation outweighed any detrimental effects and permitted Garth to move with the children to Arizona. The trial court entered written findings on each factor in its final order and findings about the objection and petition to relocate with the children. Jessica argues that the court erred in its analysis of several of these factors.[4] We agree with Jessica and conclude that the trial court abused its discretion in its analysis of RCW 26.09.520 relocation factors 1, 3, 5, 6, 8, and 9. We address each in turn.

---

[4] Relocation factor 2, pertaining to prior agreements, relocation factor 4, pertaining to limitations under RCW 26.09.191, and relocation factor 11, pertaining to temporary orders, do not apply and are not at issue. RCW 26.09.520.

B.

The first factor addresses the "relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life." RCW 26.09.520(1). Jessica argues that the trial court made several errors in analyzing factor 1. Jessica asserts that the trial court considered irrelevant facts and the findings are unsupported by the record. We agree.

During the trial court's oral ruling, the trial court stated, "[t]his is a complicated factor in this case because while it's clear that the child that we're most concerned with here, [R.R.], because of [L.R.'s] generally greater ability to adapt to whatever situation comes up." This was the trial court's only reference to L.R.

The written finding states:

The mother is [R.R.'s] primary emotional attachment figure, but it is not necessarily a healthy relationship. This is clear from the mother's behavior throughout the trial. The mother's anxiety fuels [R.R.'s] anxiety and [R.R.] alters her behavior and/or stories to please the mother. The Court does not find that the mother is purposely doing this, but that it is occurring nonetheless, and it is not helpful to [R.R.'s] condition or development. This factor is not predominantly in favor for [Jessica] in spite of the fact that she is the child's primary attachment figure. Factor is neutral, which weighs in favor of the father.

First, while Jessica testified that she had been diagnosed with postpartum anxiety, the diagnosis was from after R.R. was born 11 years ago. Jessica explained that it took some time to diagnose her anxiety, as postpartum depression is more common, but after three months, things started getting better. While Jessica continues to go to therapy, she mostly deals with issues sleeping and stress, including this relocation dispute.

Second, none of the professionals who work with or assessed R.R. testified that Jessica's anxiety in any way fueled R.R.'s own anxiety. "Generally, the trial court is free to reach its own conclusions from the testimony before it. However, 'the trial courts should rely on expert opinion to help reach an objective, rather than subjective, evaluation of the issue.'" In re Custody of Stell, 56 Wn. App. 356, 368, 783 P.2d 615 (1989) (quoting In re Marriage of Woffinden, 33 Wn. App. 326, 330-31 n.3, 654 P.2d 1219 (1982)). In Leaver, the appellate court found that it was manifestly unreasonable for a trial court to adopt an untrained lay opinion over the opinions of qualified experts. In re Marriage of Leaver, 20 Wn. App. 2d 228, 240, 499 P.3d 222 (2021).

In this case, the professionals all touted Jessica's ability to manage and help R.R. navigate her emotions. For instance, R.R.'s therapist, Dr. Mielenz, testified that Jessica "does an excellent job of helping [R.R.] with her anxiety and her emotions. Her mom listens carefully. She helps [R.R.] name the emotions. She provides understanding and validation. She doesn't judge what [R.R.] is feeling, but she accepts whatever [R.R.] tells her." When asked whether R.R.'s issues could be exacerbated by a parent, R.R.'s pediatrician testified:

> For sensory processing disorder, you have that. That is not something that someone can give you. That's your genetic makeup and how your brain works. So the answer to that is no. [R.R.] has now also been diagnosed with autism, also something that is in her genetic makeup and cognitive development.

Principal Lutz testified that Jessica has been an advocate for the needs of R.R. and P.R. when she was in the school district.

Only Garth testified that he would hear R.R. telling Jessica a different story than what had actually happened. But Garth also testified that these conversations occurred

in the very early days of the children's relocation to Arizona, just a few weeks before trial.

The trial court also failed to consider the children's relationships with other significant people in their lives. Garth's parents live in the Phoenix area, about an hour and 15 minutes from Garth's new home in Gilbert, Arizona. But none of Garth's siblings or their children live in Arizona. In contrast, most of Jessica's family, including the children's aunts, uncles, and cousins, live in Washington. There were regular family gatherings and the children would see Jessica's sister Sarah and her children weekly.

R.R.'s best friend E. is also here in Washington. Dr. Mielenz explained that children with autism struggle with friendships and that R.R. was upset that she would never have time to see E. on visits to Washington. For a child with autism like R.R., other significant relationships could include their therapist and school counselor. And in this case, R.R. had worked with Dr. Mielenz for two years and had a good relationship with her, and R.R. was attached to her school therapist at Eagle Rock who planned to meet with R.R. weekly to help her transition to middle school.

We find that the trial court abused its discretion with respect to this factor because it relied on facts that were not supported by substantial evidence and rejected uncontroverted credible evidence. Smith, 12 Wn. App. at 582.

C.

The third factor addresses "[w]hether disrupting the contact between the child and the person seeking relocation would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation." RCW

26.09.520(3). Jessica contends that the trial court erred in factor 3 by issuing an "armchair diagnosis of [R.R.'s] needs." We agree.

The trial court found:

> The father's calm, quiet, and attentive demeanor is what benefits the children the most. [R.R.] needs emotional dampening down and approaching things in a calm, organized fashion and not getting all worked up about everything and for her to lose contact with her father would be very detrimental to her under these circumstances. On balance, the father has the ability to work with the children and handle what is important for them and provide for their calm and steady development. This factor weighs in favor of the father.

Multiple witnesses testified that R.R. and Jessica have always been very close. During the dissolution, the GAL found that "Jessica seems to have [a] close emotional bond with the girls." Jessica's sister Sarah testified that "both of the girls are much more attached emotionally to their mother than to their father" and R.R. "has always had a much stronger bond with Jessica than Garth. And I think that's because Jessica has always done her best to connect emotionally with [R.R.] and made that a really big focus as a mom to try to [be] that emotional support for [R.R.]" Jessica's mother testified that "[e]ver since [R.R.] was little, she's had a really strong emotional attachment to her mom." Jessica's sister Lauren described R.R. as noticeably less anxious when Jessica is around her. The trial court found that R.R.'s primary emotional attachment was to Jessica.

Despite that finding, the trial court failed to discuss how relocating R.R. away from Jessica would impact R.R. Dr. Mielenz testified that R.R. has a "clear connection to her mom as the primary attachment figure." She also testified that if R.R. remained in Washington "she would be with her primary attachment figure, she would be in the

community where she's known, she would be with her friend [E.] . . . not having to go through all these major transitions in her life would be so helpful for her because I think it's short term and long term trauma for her."  "[R.R.] is one who's always going to struggle with anxiety, and it's important for her to be in a situation where people understand and listen to her emotions and help her figure out how to struggle with anxiety . . . it needs to be managed."

The trial court failed to address evidence in the record that just the thought of relocating had caused R.R. significant distress.  Dr. Mielenz testified that R.R. had regressed and was overwhelmed and distraught about the relocation.  R.R.'s pediatrician testified that just before the move, R.R. had been vomiting multiple times a day because of anxiety.  R.R. had lost 13 pounds in 3 months, dropping from the 50th percentile to the 15th.  And she had to be admitted to Seattle Children's Hospital.  Dr. Pineyro described R.R. as "extremely sick right now" and Dr. Mielenz testified that R.R. has "shown us that a move to Arizona is not good for her emotionally, socially, physically."

Rather than address how the relocation would disrupt R.R.'s relationship with Jessica, the trial court concluded that R.R. needed "emotional dampening down," a statement not supported by professionals who work with R.R.  We conclude that the trial court abused its discretion with respect to this factor because it failed to consider the necessary relevant facts.  See Shrauner, 16 Wn. App. 2d at 412.

D.

The fifth factor addresses "the reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the

relocation." RCW 26.09.520(5). Jessica argues that the trial court's analysis of this factor is unsupported by the record and fatally flawed because Garth repeatedly and emphatically falsified his reasons for the relocation. We agree.

While the fifth factor considers both the relocating parent's and the objecting parent's motivations, both should be considered together and weighed as one factor. See McNaught, 189 Wn. App. at 558-59 (considering both parents' reasons for and objections to relocation together in analysis of factor five).

During its oral ruling, the trial court found that both parties acted in good faith. But the trial court stated:

> I am certainly disturbed by Mr. Rich's misrepresentation at the temporary hearing about the nature of what was driving his relocation because he clearly overstated it in saying he was going to lose his job and lose a bunch of money that had been spent on his education if he didn't take this position and move to Arizona . . . So while I'm not happy with this, the way he presented this issue to Judge Rosen in dealing with the temporary order, I don't find that this predominates in favor of mom. I think it's basically a wash in this case.

The trial court's written finding states:

> The Court finds that the father misrepresented the circumstances associated with his job transfer with Boeing. Nevertheless, there are career advancement and development opportunities in Arizona given it is the headquarters associated with his department and other members have been transferred to Arizona as well. This factor favors the father.

As for Jessica, the trial court found "the mother's reasons for objecting to the move were given in good faith. This factor favors the mother."

At the temporary relocation hearing, Garth argued that the relocation was "mandatory" for him to maintain his employment with Boeing. And Garth asserted that he would be responsible for the $45,000 that Boeing spent on his master's degree if he

chose not to relocate. His written response to Jessica's objection contained similar assertions: "I would lose my job, my income, and would be obligated to reimburse my employer for my Master's degree"; "I either have to relocate to Arizona or I lose my job and be obligated to pay for a degree that my employer has funded ($42k)." And in his response declaration, Garth made the same assertions, that the relocation is mandatory, that if he did not relocate he would be unable to continue his employment with Boeing, and he would have to reimburse Boeing for his master's degree.

In contrast, at trial, Garth testified that the Arizona job was a career advancement opportunity for him and that he "would inevitably have to look for a different job and ultimately a different career path" because he "could eventually get laid off." Boeing had contacted Garth in December 2020 asking if he was interested in this job opportunity in Arizona, and Garth told his employer that he was. While many members of Garth's department, supply chain operations, had relocated to Arizona, Boeing had not told Garth that if he did not take the job in Arizona his employment would be terminated.

As for the educational expenses, Garth testified that he owed Boeing a two-year commitment following the completion of his master's degree in 2019. He also testified that there was no sign that he would lose his job at Boeing in the next few months before he had fulfilled the two-year commitment. And the evidence showed the program would only require repayment if Garth voluntarily quit, not if Garth was laid off.

When Garth was questioned about the statements he made in his declaration before the temporary hearing, the trial court said, "[w]ell, it was, Mr. Rich, a significant misrepresentation of what was going on at the time."

The trial court explicitly found that Garth made significant misrepresentations about the reasons for his relocation. While career advancement opportunities may be a good faith reason for seeking to relocate, the evidence showed that Garth repeatedly made significant misrepresentations about being required by Boeing to relocate or lose his job and owe a significant debt. Based on the significant misrepresentations by Garth, we find that the trial court abused its discretion in finding that Garth acted in good faith.

E.

The sixth factor concerns "the age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the children." RCW 26.09.520(6). Jessica contends that the trial court's analysis of this factor ignored relevant facts and is unsupported by the record. We agree.

The trial court found, "[t]he calm steady support the father provides the children are what is needed. This factor favors the father's relocation . . . [t]he mother's relationship with [R.R.] is not necessarily healthy and it would be more detrimental to [R.R.] to have her contact with her father disrupted."

The trial court's finding that Jessica's relationship with R.R. is not healthy is not supported by substantial evidence. First, like with factors 1 and 3, none of the professionals involved with R.R. believe that her relationship with Jessica is unhealthy. Dr. Pineyro and Principal Lutz testified that they had no concerns with either parent. Dr. Mielenz testified that R.R. is connected with Jessica and Jessica "does an excellent job of helping [R.R.] with her anxiety and her emotions."

-18-

The trial court failed to address evidence in the record about how the relocation would affect R.R., a child diagnosed with separation anxiety and autism spectrum disorder. There was substantial evidence in the record that R.R. is a child who has significant difficulty with transitions. The GAL noted R.R.'s difficulty with transitions between the parents during the dissolution. Dr. Mielenz testified that this was something she worked on with R.R. and both parents. R.R. had difficulty when school moved to remote learning and then back to in-person. Dr. Pineyro testified that for a child like R.R., with a sensory processing disorder and autism spectrum disorder, transitions would be more difficult. Dr. Berrett also testified that for a child on the spectrum, any type of transition is difficult and they would experience challenges on multiple levels with parents living significantly far apart.

As for R.R.'s education, R.R. attended Eagle Rock Multi-Age school from second to fifth grade. Eagle Rock is a public charter school. Principal Lutz testified that R.R. "has grown" during that time and "went from being very not trustworthy of the people that were around her . . . [t]o being able to have, start her own kindness group . . . [R.R.'s] made huge growth in our building."

Lutz also testified that for students with interventions in place, like R.R., the school district works closely with the counseling team and teachers to help transition the student to middle school. Both parents testified that R.R. received extra support at Eagle Rock and, before the relocation, had been improving.

Again, there was also substantial evidence that the pending relocation already had a negative impact on R.R. Dr. Mielenz testified that R.R. regressed, and "was really overwhelmed and distraught about the whole thing." R.R. had an episode of

vomiting before her Father's Day visit with Garth, and R.R. told Dr. Mielenz she was afraid if she got in the car with Garth, he would take her to Arizona. The incidents of vomiting continued to increase and R.R. had to be hospitalized shortly before her move to Arizona. She had lost 13 pounds in 3 months. Garth conceded that R.R. has "had these vomiting episodes throughout her life."

Because the trial court's findings failed to adequately consider this evidence, we conclude that the trial court abused its discretion.

F.

The seventh factor addresses the "quality of life, resources, and opportunities available to the children and to the relocating party in the current and proposed geographic locations." RCW 26.09.520(7). Jessica argues that "while in theory, the same resources are available to the children in both locations, Garth has shown that he is not proactive in making those resources and opportunities available to the children in Arizona." We disagree.

The trial court found: "Both environments, the resources, and opportunities available in both states and major metropolitan areas are equal. The court finds that the desert is preferable from November – March and the Pacific Northwest is preferable from May – September. This factor is neutral and therefore in father's favor."

At the time of trial, Garth and the children had only been in Arizona for a few weeks. R.R. had started at her new charter school and had her first appointment with a new pediatrician. Garth had provided the school with Dr. Berrett's evaluation of R.R., and R.R. had met with the school counselor.

While limited, the trial court's findings adequately address the factor regarding the two geographic locations.

G.

The eighth factor considers the "availability of alternative arrangements to foster and continue the children's relationship with and access to the other parent." RCW 26.09.520(8). Jessica argues that the trial court erred by considering facts extraneous to the factor. We agree.

"This factor does not require the parties to maintain the same quantity of residential time; it only pertains to whether the child could continue [their] relationship with and access to the other parent." Shrauner, 16 Wn. App. 2d at 417. The trial court found:

> The mother works in the technology field and could likely obtain a similar job in Arizona fairly easily. The schedule in the Temporary Plan provides for sufficient contact and residential time to the mother and should be maintained in the Final Plan. This factor is neutral, and therefore weighs in favor of the father.

First, it was erroneous for the trial court to consider whether Jessica could relocate to Arizona in considering this factor since factor 9 considers whether it is feasible and desirable for the other parent to relocate. RCW 26.09.250(9). In addition, the trial court "may not admit evidence on the issue of . . . whether the person opposing relocation will also relocate if the child's relocation is permitted." RCW 26.09.530. In Shrauner, the trial court erred in its analysis of factor 5, good faith, when it considered the mother's decision to move before the trial court resolved the relocation issue. 16 Wn. App. 2d at 413-14. In Shrauner, the trial court also violated RCW 26.09.530 in its consideration of factor 10, financial impact, when it considered the mother's financial

-21-

circumstances if she was to forgo the relocation. Shrauner, 16 Wn. App. 2d at 420. Thus, the trial court erred in finding that Jessica could find employment in Arizona.

Second, the trial court did not enter any findings on fostering the children's relationship with and access to the nonrelocating parent, Jessica. The trial court's statement that the temporary parenting plan provided for sufficient contact is insufficient. Under the temporary parenting plan, the nonresidential parent was not permitted to call or text the child more than once in a 24-hour period. And in the trial court's findings and final parenting plan, Jessica's phone contact with R.R. was limited further:

> The court finds that it is in the best interests of the children to place reasonable restrictions on the phone contact between mother and children. The court is not preventing the child from initiating contact with her mother; she may call her mother at any time. However the court does not want the child to be able to spend an hour a day on the phone with her mother commiserating with whatever woes her mother has or that [R.R.] imagines her mother has which has [R.R.] wallowing in whatever [s]he thinks her mother's concerns are.

Further, Jessica testified about a physical condition that makes flying, and driving, for long periods difficult. Jessica provided medical records going back to 2019 for pain in her right hip. Jessica explained that because of a pinched nerve in her back, sitting for long periods of time makes her right leg go numb. She then experiences difficulty walking for a few days. Jessica explained that this would prevent her from flying to Arizona a second time per month because her leg essentially stops working. The trial court did not mention Jessica's difficulties with travel when deciding this factor. We conclude that the trial court abused its discretion because it considered facts not relevant and failed to discuss how the children's relationship with Jessica could be fostered if the relocation was granted.

H.

The ninth factor addresses the "alternatives to relocation and whether it is feasible and desirable for the other party to relocate also." RCW 26.09.520(9). Jessica asserts that the trial court erred in analyzing this factor because it considered facts unsupported by the evidence. We agree.

As discussed above, the trial court erroneously considered whether Jessica could relocate during its discussion of factor 8. In its oral ruling, the trial court stated:

> I do think that there's the possibility of Ms. Rich being able to transfer to the Phoenix area if she wanted to do that. I recognize that may not be possible with her possible employment at Microsoft. However, employment in tech . . . [provides the] greatest ability for you to be able to relocate anywhere else because there's tech in every major metropolitan area in the world. And if you've compiled a good record working for a tech company in one place, it's not that hard to move somewhere else.

When the trial court moved to discuss factor 9, the court said, "I guess that was kind of what I was driving at previously is that it might very well be possible for Jessica Rich to relocate if she wished to do so." The trial court's written order found: "The father would have significant risk to his career if he remained in Washington. The mother would also have to obtain a new job if she relocates to Arizona. This factor is neutral and therefore weighs in favor of the father."

As discussed above, under RCW 26.09.530 the trial court may not admit evidence that the nonrelocating parent will also relocate if the child's relocation is permitted. But under RCW 26.09.520(9), the trial court may consider "whether it is feasible and desirable for the other party to relocate also."

Here, the trial court's finding that it might be possible for Jessica to relocate if she wants, was speculative. While Garth made several statements that he believed Jessica

-23-

could work remotely from anywhere, in her objection to relocation Jessica explained, "[i]t is impossible for me to move; I have a great job here with Microsoft. I also have all of my support system here and it would be extremely difficult to have to rebuild or replicate that." At the hearing on temporary relocation, Jessica's counsel explained that Microsoft had just rescinded its remote work policy. And at trial, Jessica testified that her support system was in Washington. There was no evidence in the record that Jessica's job was transferrable or even that her skill set from working at Microsoft would enable her to relocate to a different tech firm. And Jessica clearly expressed her desire not to move away from her job and family.

Because the trial court's finding was not supported by substantial evidence, we conclude the trial court abused its discretion.

Thus, because we find that the trial court abused its discretion in its analysis of RCW 26.09.520 relocation factors 1, 3, 5, 6, 8, and 9, we reverse the trial court's order granting relocation.

III.

Both Jessica and Garth request attorney fees on appeal. This court has the discretion to award attorney fees in cases brought under chapter 26.09 RCW based on consideration of the parties' financial resources. RCW 26.09.140; RAP 18.1(a). The financial declarations submitted by the parties reflect that the parties have disparate incomes, although their expenses are somewhat similar. Nevertheless, neither seems to have resources available to pay the other party's attorney fees. Balancing the parties' need and ability to pay, we decline to award attorney fees to either Jessica or Garth.

IV.

In conclusion, we find that the trial court abused its discretion in its analysis of RCW 26.09.520 relocation factors 1, 3, 5, 6, 8, and 9. Thus, we reverse the trial court's order granting relocation and remand to the trial court for further proceedings.[5] But we recognize that reversing the relocation order without some stopgap measure could be detrimental to the children. Thus, we convert the existing parenting plan, child support order, and relocation order, to temporary orders until the trial court enters new temporary or final orders.

Reversed and remanded.

_Mann, J._

WE CONCUR:

_Birk, J._        _Chung, J._

---

[5] Jessica requested reassignment to a new trial judge on remand. Because the trial judge that heard the case has since retired, we do not address the issue.